SOUTHERN RY. CO. *v.* BUSE.

(In Banc. Feb. 26, 1940.)

[193 So. 918. No. 33846.]

**Ely B. Mitchell,** of Corinth, for appellant.

754

756

Jas. A. Cunningham and Floyd W. Cunningham, both of Booneville, for appellee.

Argued orally by **Ely B. Mitchell**, for appellant, and by **Jas. A. Cunningham**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This appeal is from a judgment of the Circuit Court of Tishomingo County in favor of the appellee for damages sustained while he was riding as a trespasser on the appellant's freight train in the State of Tennessee on December 23, 1932, and on which alleged cause of action the suit was filed on the 20th day of November, 1937.

The most important error assigned is the refusal of the court below to peremptorily instruct the jury to find a verdict in favor of the appellant Railway Company. The appellee sought to establish a case of liability by attempting to prove a constructive ejectment from the train, while he and a companion, Audie Rowell, were stealing a ride thereon from Memphis, Tennessee, to Corinth, Mississippi, when the appellee got his foot caught and mashed off in the drawhead of the coupling between two box cars as the engineer in charge of the train, who knew nothing of his position of peril, suddenly put on his emergency brakes to stop the train as it approached a station at some point between Memphis and the state line. Hence, the question of liability is governed by the laws of the State of Tennessee, where contributory negligence is a complete defense, except in cases where there has been wilful or wanton injury, constituting an intervening efficient cause of the accident such as would insulate the negligence of the trespasser.

The appellee, who lived at Guntown, Mississippi, and his companion Rowell, who lived at Delmar, Alabama, went to the State of Oklahoma, some time prior to the accident complained of, where they remained for several months and until the fall of 1932, when they came to Elaine, Arkansas, and remained for awhile, before undertaking to return home just before Christmas of that year. They say that when they left Arkansas for Memphis

on December 22, 1932, via Lula, Mississippi, it had been sleeting and snowing, and that along in Mississippi the timber was bending over with ice, and the tops were breaking out; also, that the ground was slick, on account of the rain on the ground which had frozen over.

They boarded the freight train at Memphis, near two o'clock A. M., at about the fourth box car from the engine. The train contained fifty-two box cars, and later picked up two more at Middletown, Tennessee, en route to Corinth, Mississippi. At first they rode on top of the box car "as long as we could stand it without freezing to death." Then, they say that, while the train was traveling in an easterly direction, they climbed down between the box cars on the iron rods of the ladder, with one foot on a rod on the east side of the west car, and the other foot on a rod on the west end of the east car, until they were on a level with the coupling. Thereupon, Rowell warned the appellee of the danger of putting his foot on the coupling, as they rode along in that position, each one carrying a suitcase, the appellee riding on the south side and Rowell on the north side of the train. That some person then came from toward the caboose over the east end of the west car, above where the appellee was stationed, carrying a lantern in one hand, as testified to by Rowell, but, according to the testimony of the appellee, he was carrying a lantern in one hand and a stick in the other. That this person ordered them to get off the train. That he was then coming down the ladders from above the appellee with one foot stepping on the rods of the ladder on the east end of the west car, and the other foot stepping on the rods of the ladder on the west end of the east car—just as the appellee and Rowell were riding. That immediately upon such command being given for them to "fall off there" or to "get off," Rowell disembarked from the train which he said "was then going as fast as I could run handy, and I had to give a shove to keep from going under." Thereupon, appellee undertook to get off when he was within seven

or eight car lengths from the station, and when he attempted to do so he stepped on the draw-head of the coupling and got his foot mashed as the engineer placed the brakes in reverse to stop for the station. Appellee claims that he asked this unknown person who ordered them off the train to permit him to wait until it stopped, but that the man then commanded that he "get off now or I will knock you off." He later testified on cross-examination, as he continued to enlarge upon the incident as related by his companion Rowell and as testified to by himself on direct examination, and in an effort to establish agency by the declarations of the alleged agent made out of court, that this man "told us to get off that train, and said that he had the railroad orders and would knock us off if we didn't get off." As above suggested, Rowell does not claim to have heard this statement, which appellee says was addressed to "us," nor any threats alleged to have been subsequently addressed to the appellee; and, as heretofore stated, he does not claim to have seen a stick in the hand of this unknown person. He did testify that he later saw "this man or another man on the ground about one and one-half car lengths from him," and that he "had a lantern and I wouldn't say it was a brake stick, iron rod, or it could have been a flag rolled up; it was rolled up if it was a flag, or either was a stick, it looked like about as long as a flag or brake stick."

There is no testimony in the record showing that when this unknown person gave the command for these trespassers to get off the train that he drew the stick or attempted to raise it in any manner in an effort to strike either of the trespassers. It does appear from the appellee's testimony that the train was then so near the station that "they were then going though a little town and the lights were on that side," meaning the north side, and he gave as his reason for attempting to cross from the south side of the train to the north side the fact that the light could be seen there just before the

train stopped, which was within seven or eight car lengths ahead from where he attempted to get off as heretofore stated. In other words, it was clearly shown that the train was not moving at a dangerous rate of speed at the time the command to get off was given. Wherefore, it is not contended that any right of the trespassers was violated by the mere command to get off the train at that time, in the absence of the alleged threatened assault, since the criminal law of Tennessee, which they were then violating in stealing the ride, was commanding them at all times to get off while the train was not running at a dangerous rate of speed.

The testimony identifying this unknown person as a member of the train crew, if there was any such person, is not satisfactory. The appellee said: "Best I could tell he had on overalls, jumper and cap;" that "he had a lantern in one hand and a stick in the other;" that he was "about a middle-aged man;" that he "didn't have time to look and see" as to his size; and further testified that he wouldn't know him again if he should see him. He was then asked what side of the train he was riding on and he said: "South side."

"Q. What could you see? A. Not anything in the dark over there, couldn't see."

Again after testifying about stepping into the coupling, he was asked: "Could you tell what you were stepping on?" And he answered: "No, it was dark in there." In other words, he claims to have crossed over the coupling through the darkness, with a suit-case in his hand, after being warned by Rowell in regard to it, instead of getting off on the side where the man was standing over him with a lantern. Naturally the lantern should have thrown some ray of light out on that side so as to enable him to see any obstructions that may have been that near the station. He does not say there were such there. Rowell's testimony in reference to the man who gave the order to get off was that: "I took it to be

a trainman, I wouldn't swear he was a trainman, he had a lantern.''

"Q. What kind of a headpiece? A. Had on a cap.

"Q. What kind of clothes? A. Best of my judgment, overalls and jumper.

"Q. What as in his hand? A. I don't know what was in his hand, it was dark, only I know he had a lantern.

. . .

"Q. You didn't hear him say anything to Buse about knocking him off? A. No, sir. . . .

"Q. You said that was a trainman there? A. I didn't say it was a trainman, he had a railroad lantern, or a lantern, I wouldn't swear nothing in the dark.''

Most assuredly if this unknown person had been a member of the train crew his lantern would have been lighted as he undertook to walk from the caboose at least forty-eight box car lengths over a wet and icy top train, jumping from one box car to another, with a stick in one hand and the lantern in the other, to eject a trespasser before the train could stop at the next station.

Moreover, if the man was coming down the ladders on each of the two box cars just above where the appellee was situated, and with his lantern lighted, he would have had reason to assume that when he commanded the appellee to get off the train he would get off on that side under the lighted lantern instead of crossing over the coupling to the other side. In other words, the question arises as to whether or not it was a natural and probable consequence of the act of this unknown person that the appellee would attempt to cross over to the other side of the train at the risk of placing his foot into the coupling. That is to say, if it can be said that the man was negligent in assuming that appellee would pursue the safer course, instead of the more dangerous one, can it be further said that the appellee trespasser was wilfully or wantonly injured?

But why should we undertake to determine the manner

in which the appellee was ejected from the train when, according to the believable testimony, it is apparent that he was not ejected at all? He does not deny having told various persons after the accident that the train crew didn't know he was on the train. He admits that he didn't even tell his own father, or anyone else with whom he discussed the injury, about this unknown person ejecting him, until after he filed this suit nearly five years after the accident. Furthermore, it is wholly unreasonable that a member of the train crew would have left a confortable caboose on such a night and walked at least forty-eight ice covered box cars, jumping a distance of approximately three feet or more from one to the other, while the train was running between stations, with a lantern in one hand and a stick in the other, without any means of protecting himself from falling, in search of trespassers, shortly after mid-night, instead of waiting, as the rules of the company required, until the train reached the next station where he could make the search and ejection in safety while walking alongside the train.

The testimony on behalf of the appellee is also unreasonable and unbelievable wherein he contends that this unknown person came from the top of the train above him by stepping with one foot in the rounds of the ladder on the east end of the west car, and the other foot on the rounds of the ladder on the west end of the east car, for the reason that there is only one ladder on the end of a box car and that when two are coupled together it is universally true that one ladder is on one side of the coupling and the other is on the other side at least five or six feet apart, and each of which is for use when a trainman is on the particular side of the train where the ladder is located so as to avoid the necessity of crossing over the coupling in order to ascend from the ground to the top of the train, or vice versa. And certainly, it cannot be true that a man could descend two ladders in such fashion, even if they were opposite each other, while holding a lantern in one hand and a stick in the other on

a moving train, because if it was dark between the cars beneath the lantern for the appellee, it was likewise dark there for the alleged person who was holding the lantern and stick, as he undertook to accomplish such a feat of descending two widely separated ladders on a running train while his hands were otherwise occupied.

After the accident, the appellee and Rowell climbed back onto the top of the box car and rode on to Corinth where the appellee was taken to a hospital and his foot amputated. He was in the same room at the hospital with the husband of a Mrs. Bailey who testified that she visited her husband on the following Sunday and discussed with the appellee while there the accident which had befallen him; and he did not mention to her this unknown person having ordered them to get off the train; and the appellee admitted as a witness that he had never mentioned that circumstance to any of the several persons with whom he discussed the accident shortly after it happened and when he was asked the question whether: "You mean to say when you got home you didn't tell your Daddy about it?" He replied: "I just told him I was riding on a train and got it mashed; didn't tell him about that man coming there with a stick putting me off." He also admitted that he didn't remember ever telling anyone about this unknown person until after this suit was filed. He did not deny having told Mrs. Burfield, the aunt of Rowell, with whom he had boarded a year, and with whom they made the aforementioned trip to Oklahoma, and who visited him at the hospital, that the train crew didn't know that they were on the train when the accident occurred. Neither did he deny that he signed a statement in the presence of Dr. McRae and a nurse, reciting that the train crew did not know they were on the train; that he had stated that he got his foot mashed in the coupler as he moved over toward Rowell while riding between the cars; or that he did not then report the accident. Neither did he deny that the statement was read in his presence, nor that Dr. McRae asked him if the

statement was correct before he signed it. He merely testified that the statement did not reflect the facts. He made contradictory statements as to whether he was then able to appreciate what he was doing.

Rowell spent the next night with his aunt, Mrs. Burfield, and admits that he didn't tell her about this unknown person ordering them to get off the train, but admits that he did tell her, as soon as he saw her that morning, about having cautioned the appellee not to place his foot on the coupling while they were riding between the two box cars, thus implying that the accident was the fault of appellee. He also admits having signed a statement at his home at Delmar, Alabama, when his mother was present and cautioned him to tell the truth. That statement makes no mention of this unknown person having forced him and the appellee off the train, but it does recite that they rode on top of the train for awhile and that the appellee "Vardaman (Buse) said he was cold, he got down between the two cars and rode there until his foot was injured. At the time I was on top of the car, holding to the brake looking down, and Buse started to cross from one car to the one I was on and he got his foot caught in the coupler. I started down to him but he got his foot out before I got to him."

There are various contradictions in the testimony of the appellee as to the circumstances of the accident. For instance, at each of the stations where the accident could have happened under his version of the matter, and that given by Rowell, it was shown that the depot was located on the south side of the railroad where the appellee said it was too dark for him to get off, and that there were no lights at those designated stations on the north side toward which he crossed over for the purpose of getting off.

Only the conductor and flagman were riding in the caboose, and they both testified that they were not wearing a cap or overalls and jumper, but were dressed in other kind of clothes; and that neither of them left the

caboose between stations. It is not reasonable that the conductor would have been walking the train on such a night between stations at two or three o'clock in the morning, and the flagman's duty would have been at the back end of the train to guard and protect it as soon as it should stop at a station; and it would have been criminal negligence for any railroad company to have required any employee to have endangered his own life by walking on top of a moving train on such a night in search of trespassers. The rules not only did not require this of any of the train crew, but prohibited the ejection of trespassers while the train was running. Neither appellee nor Rowell testified that either of those two employees in particular were at the scene of the accident, and they both accounted for their own whereabouts. It is true that the court is not bound by their testimony, but here they are strongly corroborated by the fact that it is altogether improbable and unbelievable that either of them would have walked the train to where appellee and Rowell were under such circumstances. But, if it be assumed that some person appeared and gave the order to get off, then it is further true that neither appellee nor Rowell were certain that the man was even dressed like a trainman. One of them testified that "Best I could tell he had on overalls, jumper and cap," while the other testified that "he had on a cap" and to the "best of my judgment overalls and jumper." Moreover, there appears no good reason to disbelieve the testimony of the conductor and flagmen since they testified to the hurt of the railroad company when admitting the right of members of the crew, in addition to the recognized authority of the conductor, to eject trespassers from trains. In those cases where the identification of a member of a train crew has been deemed sufficient when based on a description of their wearing apparel, it is to be noted that they were also seen performing some service in connection with the operation of the train, as where the train moves according to signals given by the person in ques-

tion, etc. Yazoo & M. V. R. Co. v. Cornelius, 131 Miss. 37, 95 So. 90; Southern R. Co. v. Eaks, 220 Ala. 49, 124 So. 88. No case has been called to our attention where a description of the way in which the alleged servant was dressed, or the mere fact that he had a lantern, was deemed sufficient to meet the burden of proof required of the plaintiff to establish agency. It may be conceded for the sake of argument, as was done in the testimony, that it would have been unusual and unlikely that another trespasser would have give such an order, yet the fact would remain that it is still unbelievable that a member of the train crew came from toward the caboose to the scene of the accident under the circumstances testified to in this case.

Viewing the entire testimony in the light of the previous decisions of this court that verdicts should rest on reasonable probabilities, and not mere possibilities, it is clear that the request for a peremptory instruction in favor of the appellant should have been granted.

Reversed, and judgment for appellant.

DISSENTING OPINION.

**Ethridge, J.,** delivered a dissenting opinion.

I think this was a case for the jury, on conflicting evidence. I do not think we should overturn their verdict, since the jury have the witnesses before them, see their expression and demeanor, and frequently know something of their standing, merely because, in looking at the evidence contained in a type-written record, we would find contrary to the verdict of the jury.

I am not strongly impressed with the force of appellee's evidence, from a reading of the record; and perhaps if I were trying the case as an original trier of facts, I would find contrary to the jury's verdict. But I do not know what I would have decided on the conflict of facts, had I been on the jury, seeing the witnesses in person, noting their manner of testifying, and the various indications which throw light upon the truthfulness of a wit-

ness. The jury are presumed to have been selected in accordance with the statute requiring that they shall be men of good intelligence, sound judgment, and fair character. Twelve men, considering questions of disputed fact, and discussing them in the light of common, everyday experience, are more likely to reach a correct result than is a judge, merely considering his reaction to the statements of the record. Furthermore, the verdict in this case was approved by the trial judge, who had superior opportunity for determining the correctness of such verdict.

Trial by jury is an ancient institution which has safeguarded society through the centuries, its value consisting in the fact that the jury is composed of a number of men selected for their intelligence and impartiality, who have the opportunity to see and judge of the veracity of the witnesses, and of their capacity to testify to the truth.

It was proved in the case before us that there was considerable contradiction of the evidence given by the appellee and his companion by witnesses who testified to statements made subsequent to the injury, and which tended to weaken the probability of such evidence. But these matters were entirely in regard to the credibility of the witnesses, and the weight and worth of their testimony.

What is claimed to have occurred on the train at the time of appellee's injury does not appear to me to be improbable or unreasonable. The testimony is only weakened by the statements alleged to have been made to other persons after such occurrence, and does not directly dispute the testimony as to what took place at the time of the injury.

The testimony of the plaintiff and of his companion is to the effect that they boarded the freight train in the Forest Railroad Yard in the city of Memphis on a bitter cold night, and the cold becoming unbearable they sought protection from the wind between the two box cars. While there, on ladders attached to the box cars, a per-

son dressed in overalls, jumper and cap of the kind usually worn by trainmen, came over the train which was moving about as rapidly as a man running, and ordered them to get off. Whereupon, appellee's companion, having had some experience in riding trains jumped off the north side of the car, on which side he had been standing, without being injured; but appellee possessed no such experience in catching rides on freight trains, and getting off. He testified that he requested the person who commanded him to get off the train, to stop it in order that he might do so, as it was approaching a town, or seemed to be, and was slowing down. But this person, whom he took to be a railroad man, stated that if he didn't get off he would knock him off. Appellee testified that the side on which he was riding was dark, that he could not see where, or into what, he would be jumping, and upon being told to jump he started toward the north side, on which there was some light, and caught his foot in the coupling, which mashed his foot off.

It is difficult for me to believe that any other person than an employee of the railroad company would be on the train, armed with a lantern and a stick of some kind, and would undertake to put trespassers off at the time of night of this occurrence. It is unreasonable to suppose that some intermeddler would be in such a place on such a mission on a cold night, and at a late hour—the high probability is that he was a member of the train crew.

Two members of the crew, on the night in question, in the interval between the accident and the bringing of the suit, had died, one being the head brakeman, who would be under the duty of protecting the train from trespassers riding thereon without authority.

The witness Rowell, appellee's companion, said that after he got off the train he went back to get his grip, which he had thrown off, and that he then saw the person he had seen on the train, or another, walking down the side of the train with a lantern and stick in his hand.

It is true that the fireman on the train and the conduc-

tor and flagman (who were back in the caboose) testified that they did not go over the train, and that no one left the compartment for this purpose. But the flagman was under duty to protect the rear of the train when it stopped, and did so on this occasion, when the train stopped at Middleton, Tennessee, where they were to take on two extra box cars, which necessitated a switching movement which required several minutes to perform. Naturally the head brakeman would be under the duty to go down the train, to see that all was in proper shape and condition, and that the box cars were properly placed in the train. Of course, he was not produced to testify about this matter. The rule of the company prohibits trainmen from making people get off a moving train, requiring them to wait until the train stops to eject trespassers. The negro fireman, Bunk Smith, testified that on the night in question the trainmen were dressed in overalls and caps, and carried lanterns and coupling sticks, which he described in his evidence. He further testified that a third person would not have been permitted to interfere in the management of the train or the ejectment of a trespasser therefrom. He also testified that all trainmen were required to look out for trespassers and to assist in ejecting them. See 52 C. J. 651, 652; Illinois Cent. R. Co. v. Brown (Miss.), 39 So. 531; Loper v. Yazoo & M. V. R. Co., 166 Miss. 79, 145 So. 743.

It is inconceivable to me that any person not a member of the crew would undertake to make a trespasser jump off a moving train, with no motive for so doing, and no duty or authority in the matter. It is not at all improbable that one of the crew went over the train for some purpose in connection with its operation; and the positive testimony of the appellee and his companion is to the effect that there was such a person, dressed as described, that he had a lantern and stick, and that he directed them to jump off, threatening that they would be knocked off unless they did so.

There is no dispute as to the appellant's having sus-

tained an injury on the night in question, on this train, because on reaching Corinth, Mississippi, he was carried to a hospital, where his foot was amputated and he received treatment, the hospital being owned by a doctor who has since died, but who at the time was surgeon for the railway company, and who interested himself in taking a purported statement from Buse.

When examined in regard to statements taken at the hospital, Buse testified that he did not know what he signed; that he signed something, but did not remember some of the statements attributed to him. The same thing was true with reference to the statement made by Rowell to the claim agent of the railway company, he also testifying that he did not know exactly what was in the statement signed by him.

The evidence, from the standpoint of these alleged statements, is unsatisfactory. There was considerable time between the accident and the bringing of the suit, which was accounted for by the appellee on the theory that an attorney whom he consulted advised him that suit was barred by the statute of limitations—which advice proved to be erroneous; but this accounts for delay in bringing the suit.

It is with reluctance that I dissent from an opinion in a case where the evidence, to my mind, is so unsatisfactory. But I think this court should be cautious not to usurp the functions of the jury in deciding issues of fact. If the judgment were to be reversed merely that a new trial might be had, as being against the weight of the evidence, I would probably join in such opinion; but I think that we should never reverse a jury on the theory that one of the parties was entitled to a peremptory instruction, where there is some evidence to support the jury verdict, although it might appear to be against the weight of the evidence. In proper cases we are required to reverse the verdict of a jury as being contrary to the weight of the evidence; but in such case we should let another jury pass upon it, being authorized to set aside

as many as two judgments on that ground, that being the limit of new trials to be granted to the same party under section 592, Code of 1930.