JAKUP *v.* LEWIS GROCER Co. *et al.*

(In Banc. Feb. 24, 1941. Suggestion of Error Overruled, March 24, 1941.)

[200 So. 597. No. 34317.]

Alexander & Sparkman, of Cleveland, for appellant.

Leon F. Hendrick, of Jackson, and Palmer Lipscomb and Dugas Shands, both of Cleveland, for appellees.

**Griffith, J.,** delivered the opinion of the court.

Four men were riding on an eastbound pick-up truck at about four o'clock on a September afternoon. The weather was dry, the highway was of gravel, and there was much dust. When this eastbound truck was within about a mile west of Cleveland, its destination, it was passed by a westbound truck on a bridge, the roadway of which was nineteen feet wide. The eastbound truck, in crossing the bridge, remained well within its right of the center of the bridge, but the westbound truck as it went upon the bridge swerved too far to its left and into and within the left of the center of the bridge, and thereby ran

so close to the pick-up truck as to strike and seriously injure the right foot of plaintiff, appellant here, who was riding on the body of the pick-up truck with his foot resting upon the left rear fender.

The decisive question is as to the identity of the westbound truck. As a predicate for the contention that this truck was one owned by, and was being driven by a servant of, the defendant, Lewis Grocer Company, one of the appellees here, it was shown that a truck belonging to the Lewis Company and driven by a colored man left Indianola between eight and nine o'clock that morning loaded with groceries to be delivered at Bogue, Busey, Skene, and Pace, and that the truck was to take on some merchandise at Greenville. There were no deliveries to be made or accepted at Cleveland. The truck was G. M. C., ton and a half in capacity according to the manufacturer's rating, was painted red and was supplied with a brown or grayish brown tarpaulin upon which there was a sign reading "Lewis Grocer Company." No person who accompanied the truck was introduced as a witness. But it is shown that deliveries were made by one of the several trucks owned by the Lewis Company to eight different retailers at Pace that afternoon, but at what hour not a witness was able to say. The truck returned to Indianola between five and six o'clock.

The testimony mentioned in the foregoing paragraph is of no aid to the case for the reason that, looking at a map of the territory, it can be readily seen that if the Lewis truck began its deliveries at Pace, the probabilities are that it would have reached that point in the forenoon; while on the other hand, and which is the more probable, if it went first to Greenville, thence through Bogue to Busey, its direct and therefore probable route thereafter would have been from Busey to Skene and from there to Pace, arriving thereby at the latter point in the afternoon, but by this route it would not have gone via Cleveland and thence in a westerly direction to Pace, although after it left Pace it may have gone via Cleveland to Indianola;

and, if so, it would have traveled eastwardly, whereas it is undisputed that the offending truck was going westwardly at the time of the injury.

Moreover, it is shown that 205 separate articles of merchandise were delivered by a Lewis truck at Pace on that afternoon. Every recipient signed an itemized receipt, which meant, among other purposes, that the driver was obliged to account on his return at the close of the day for every piece of merchandise with which he departed in the morning. But two of the witnesses who saw the offending truck noticed, immediately as it had passed the eastbound truck, that the back gate of the offending truck was down or open, and the truck was traveling from forty-five to fifty miles per hour. If this was the Lewis truck, the back gate would not, as a matter of probability, have been down, allowing the merchandise, or some of the numerous articles thereof, to spill out behind as the truck proceeded at this high speed.

None of the four persons on the eastbound truck attempted to give any identification of the offending westbound truck which would distinguish it from tens or hundreds of other like trucks which travel the highways of this State on every business day; and not one of plaintiff's five witnesses hereafter to be noted was able to say, or at least they did not say, whether the driver of the westbound truck was a colored man or a white man or whether he was accompanied by another person. Plaintiff as a witness in his own behalf admitted that he could give no description of the truck, and about the only significance in the course of his testimony, as to identity, was that therein the defendant laid the predicate to show that the claim made in a few days after the injury was against a concern called the Goyer Company—not the Lewis Company. Boykin, who was riding on the right-hand side of the eastbound truck, said that the offending truck was of good size, was red, with wooden body and had a brown tarpaulin over it, but he saw no writing or signs on truck or tarpaulin. Carter, the driver of the

eastbound truck, testified about as did Boykin, except that Carter said that the tarpaulin had a sign on it, and when asked the direct question whether he could read the sign, he evaded and answered that he did not read it. Mahan, who was riding next to the driver, Carter, said that the westbound truck was large and covered with a tarpaulin, but he could not tell the color or whether there was any sign or writing on it. The situation of this witness Mahan was the best among all the witnesses to make observations, but he explained that the dust was too heavy to enable him to do so.

If there was an identification sufficient to go to the jury, it must be found in the testimony of the witness Page who was driving a car following the eastbound truck and about 100 yards behind it. He did not see the accident and didn't know that an accident had happened until he caught up with the eastbound truck, which stopped as soon as plaintiff notified the driver thereof that he had been hurt. Page said that a few moments before he reached the bridge, he passed a westbound truck but that he could not say what kind of truck it was. That he was traveling about 40 miles per hour and the westbound truck about 50 miles per hour, but that he did see a tarpaulin on the westbound truck; that this tarpaulin was loose and flopping, but that nevertheless he read on this tarpaulin a sign reading "Lewis Grocer Company." He admits the dust as mentioned by the other witnesses, swears now that he did not notice the character of the truck, or even so much as its color, and admits that thirty-eight days after the accident he signed a written statement in which there was this recital: "I saw the truck as it was coming toward me, and it was a red truck with a tarpaulin over it, flat. I didn't see any sign on it, and don't know who it belonged to, nor what was in it. I didn't notice it closely, as it was going fast and it was very dusty." When confronted with this statement, he parried with the assertion that he did not read the statement before signing it, and says that he did not do so be-

cause he "just can't read that good—that is the reason."
This statement was given to a man named Hogan, and it
was attempted to be shown by Lewis, the president of
the Lewis Company, that Hogan was representing the
Lewis Company in obtaining the statement, but Mr.
Lewis testified, without dispute, that he didn't know
Hogan. There is a noticeable inaccuracy, or want of ac-
curacy, in Page's testimony as to all such features as
time, distance, and location.

On the close of all the testimony introduced by plaintiff,
there was a motion to exclude and for a peremptory
charge, and the trial judge after reviewing all that testi-
mony and considering it in all its bearings was of the
opinion, which he dictated into the record, that the evi-
dence was insufficient and he sustained the motion and
granted the peremptory instruction; and his action in so
doing forms the real issue upon this appeal.

From the beginning of the judicial history of this State
the power and duty of trial judges to grant peremptory
instructions and to set aside verdicts has been recognized
as an integral part of our state constitutional system.
In the early days when the judge charged the jury orally
this authority was generally accepted as without ques-
tion, but after the passage of the Act of December 16,
1830, under which the judges were forbidden to comment
on the evidence or to give any charge unless requested
by one of the parties, it was inevitable that the question
would be raised whether, under that statute, peremptory
charges could be given, and it was raised at the January
Term 1841 in Perry v. Clarke, 5 How. 495, but the Court
held that the judicial authority to direct a verdict was
unaffected by the cited statute.

But for more than seventy-five years after that deci-
sion, the Court did not attempt to lay down any precise
formula as a test by which to determine whether or when
a peremptory instruction should or should not be given.
Whether it was thought that such a formula should not
be attempted until after long years of a case to case

experience, or whether it was considered that such a prescription might unduly confine or canalize what has been adverted to in our latest case, Truckers Exchange Bank v. Convoy, 199 So. 301, 190 Miss. 242, as the exercise of an intuitive judgment more subtle than any articulate major premise, we may not definitely know. But we do know that during the last twenty-five years a closer and closer approach, although always with careful circumspection, toward such a formula has been made until at last in Thomas v. Williamson, 185 Miss. 83, 187 So. 220, 221, a definite prescription was attempted in the following language:

"When all the testimony in behalf of a party litigant is taken as a whole and is considered as if undisputed by the other party, and that testimony is reconcilable in essential features with the material facts which are undisputed, and when so reconciled, and taken together with the undisputed facts, is of such a real and substantial nature that impartial men of sound judgment could reasonably believe it, and prudently act thereon, and thence it furnishes a factual basis adequate to sustain the case of the party, a peremptory instruction should not be granted against him. But if the testimony in behalf of the party does not measure up to this established standard, it is insufficient"—and the peremptory charge should be given.

And while the verbiage of the quoted prescription is capable of improvement, and doubtless will be improved upon at some time as the years go by, and while even now the Court is not to be confined and canalized within it, in a strict and literal sense, it is to be observed that in our latest case dealing with the subject, Truckers Exchange Bank v. Conroy, supra, the heart of the formula was notably impressed in its real and vital significance, namely, may sound and reasonable men engaged in a search for truth, uninfluenced by bias or any improper motives, safely accept and act upon that evidence as true. And another recent case which may well be ex-

amined in this connection is Southern Ry. Co. v. Buse, 187 Miss. 752, 193 So. 918.

Could the court safely accept and act upon the isolated statement by the witness Page that, although there was nothing then known to him to put him on the alert as to it, he read the contents of a sign on flopping tarpaulin covering a truck approaching him at fifty miles an hour when he was going in the opposite direction at forty miles an hour in a deep dust and when he saw nothing else about the truck even as to its color, and when all the other witnesses who saw it and who had an equal or better opportunity and more of an occasion to observe it saw more of the details of the truck than he did, yet did not pretend that they could in such circumstances read the sign—and this even though we lay aside his contradictory statement made soon after the happening?

We concur with the learned and experienced trial judge that the statement could not be safely accepted and acted upon. Courts are not required, they are not permitted, to lay aside common sense and the exercise of that critical judgment which years of experience with witnesses will produce, and accept as true any and every statement which some witness may be so bold as to make, simply because the witness, who has, in all reasonable probability, substituted an after-acquired imagination for facts, has sworn to it.

Affirmed.