757 So.2d 201 (2000)
Wonda DOE
v.
Gaines L. STEGALL, Individually and d/b/a Nottingham Place Apartments, Gaines W. Stegall and Betty Stegall.
No. 1998-CA-01058-SCT.
Supreme Court of Mississippi.
March 2, 2000.
*202 Shane F. Langston, Crystal Wise Martin, Jackson, Attorneys for Appellant.
Robert S. Addison, Edward C. Taylor, Jackson, Attorneys for Appellees.
BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.
WALLER, Justice, for the Court:

STATEMENT OF THE CASE
¶ 1. Wonda Doe filed suit against the owners and managers of an apartment complex after the apartment that she was renting from them was burglarized and she was raped. Doe alleged that the defendants had failed to provide adequate lighting and security and failed to maintain safe key control and access. This appeal arose after the defendants were granted summary judgment. The only issue raised on appeal is whether the trial court, in granting the defendants' motion for summary judgment, erred in excluding the deposition testimony of the criminal assailant, Michael Herrin.

STATEMENT OF THE FACTS
¶ 2. Wonda Doe leased an apartment at Nottingham Place Apartments on Ridgewood Road in Jackson, Mississippi, in May of 1993. The apartment complex was owned by defendant Gaines L. Stegall, and managed by his son, defendant Gaines W. Stegall ("Billy"), and his son's wife, defendant Betty Stegall. In the early morning hours of September 22, 1993, Doe was awakened by a noise in her apartment. She went downstairs and turned on the lights to investigate, but could find nothing unusual. She went back to bed. After hearing another noise, she looked up to find a man with a knife approaching her bed. She struggled with the assailant, who blindfolded and attempted to gag her. Early in the assault, Doe's three-year-old son, the only other occupant of the apartment, entered her room. The assailant insisted she send the child back to his room. After Doe pleaded with the child to go back to bed, he left the room and, to Doe's knowledge, did not return during the attack. Doe begged for her life and the life of her child. The assailant cut Doe's panties off and forcibly raped her. He stayed in Doe's apartment for close to two hours, during which time he raped Doe a second time. Throughout the incident, Doe and the assailant were engaged in conversation. Doe attempted to keep the assailant calm and to learn whatever useful information she could give to the police. During the conversation, the assailant informed Doe that he had entered the apartment through an unlocked window leading into her living room. Doe speculated at that time, and in giving the police report, that her son had unlocked the window without her knowledge. (The window was found to be unlocked and opened after the attack.) However, Doe maintained in her deposition and affidavit in support of her opposition to summary judgment that her son had never been known to disengage a lock on a window. In addition, Doe testified through affidavit that there were aluminum shades and a sofa in front of the window, that did not appear to be disturbed the night of the attack. The assailant, later identified as Michael Herrin, testified in deposition that the window was indeed unlocked. He further stated that he removed the screen and opened the window to make the entry appear forced, but could not enter the apartment easily through the open window because the blinds and the couch blocked his entry.
¶ 3. Doe never actually saw the assailant, as she was blindfolded most of the time he was there. The assailant removed the blindfold before he left, while Doe filled out a deposit slip and handed over her ATM card and code, as well as her car keys, at the assailant's request. After the assailant left, Doe and her son fled next door to the apartment of her neighbor, who called the police. She returned to her apartment with the police to get clothes for herself and her son. While Doe was in her apartment, the assailant called her to *203 tell her where he had left her car. The assailant expressed shock that she had called the police and hung up the phone when she tried to get him to hold on the line in an effort to allow the police officer present in her apartment to monitor the conversation. Apparently, the assailant had left Doe's car across the street near a convenience store and gas station and had called her from a pay phone while watching the police cars outside her apartment.
¶ 4. Based on this incident, Michael Herrin pled guilty to charges of burglary of an occupied dwelling, rape, and armed robbery, and was sentenced as an habitual offender to a term of 20 years.[1] He is currently confined in the state penitentiary at Parchman. After Doe filed suit against the apartment complex and its owner, Doe's counsel visited Herrin at Parchman to interview him. Herrin refused the interview. After a second attempt, Herrin consented to a short interview with Doe's counsel and an investigator, Jim Black, former Chief of the Jackson Police Department. Herrin then wrote letters to Doe, her attorney and Black. Herrin expressed remorse over his crime and a desire to aid Doe in this legal action. Herrin claimed to have factual information that was shocking and would place the apartment management in a bad light. In the letter, Herrin requests aid in straightening out a mistake in his sentencing; nevertheless, the letter does not make his testimony contingent on the requested aid. There is no dispute that Herrin has never received any help or any other tangible thing from Doe or her attorney or investigator. In an informal interview given to Doe's counsel and Black, and later in deposition to counsel for both sides, Herrin testified that he had entered Doe's apartment with a duplicate of a master key, which had been given to him by Betty Stegall. Herrin had been living in Nottingham Place apartments with his father after having been released from prison. Herrin was locked out of the apartment one day and went to Betty Stegall to get a key. She gave him a key to let himself back into the apartment and instructed him to return the key to her. Herrin tried to unlock the key of a neighboring apartment as well and discovered that the key was a master key that would open many apartments, if not all. A week later, Herrin again went to Betty Stegall, whom he claimed had been drinking, saying that he was locked out of his father's apartment again. Betty Stegall again gave him a key, which he took and had duplicated.
¶ 5. Herrin refused to produce the key at the deposition, but said that he would produce it at the time of trial if necessary. Herrin claimed that he had arranged for a friend to pick up the key and did not want to get her into trouble. When asked again by Doe's counsel if he would produce the key at trial, Herrin testified "If it goes to trial and the Court so orders, I'll still have to take it under consideration because I have to involve someone that I really don't want to involve, but I will." After a motion to compel by the defendants, the circuit court judge ordered Herrin, through an agreed order from both counsel, to produce the key. In response, Herrin wrote a letter to the judge wherein he stated that he "can't produce a key which does not exist." Herrin further stated that being held in contempt did not concern *204 him, as he would not be released from prison until age 56 or 58 anyway. Herrin concluded the letter by saying that "[i]t would be a waste of the court's time to have me brought on court order for something, a key, that can't be produced."
¶ 6. In its Memorandum Opinion and Order, the lower court ruled in favor of the defendants on their motion for summary judgment. The court concluded that the defendants had provided Doe with reasonably safe premises, since the criminal activity of Herrin was unforseeable, finding against Doe on her allegations that the defendants had failed to take reasonable measures to ensure the personal security and safety of Doe and had failed to maintain the window locks, screen tenants, or engaged in other negligent management practices. The court further found in favor of the defendants on the allegations in Doe's complaints concerning negligent key control, finding that the testimony of Herrin was "incredible and unreliable and should be disregarded by the Court." Doe's only assignment of error addresses the exclusion of Herrin's testimony as evidence of a genuine issue of material fact and does not attempt to revive the other dismissed allegations of her amended complaint.

DISCUSSION
¶ 7. The standard of review for summary judgment is well-settled in Mississippi jurisprudence. This Court conducts a de novo review of summary judgment motions. Therefore, the Court considers facts without any deference to the trial court and applies its own interpretation of the law. Daniels v. GNB, Inc., 629 So.2d 595, 599 (Miss.1993).
¶ 8. Rule 56(c) of the Mississippi Rules of Civil Procedure allows summary judgment where there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. The evidence, including pleadings, depositions, answers to interrogatories, admissions, and affidavits must show that there is no genuine issue of material fact. This evidence should be viewed in the light most favorable to the party opposing the motion for summary judgment. Nassar v. Concordia Rod & Gun Club, Inc., 682 So.2d 1035, 1042 (Miss.1996).
¶ 9. This Court has held that a trial court should err on the side of denying motions for summary judgment. Daniels, 629 So.2d at 599. In doing so, this Court has implicitly recognized that summary judgment is a powerful instrument that affects the substantive rights of a party and does away with the noble American ideal of affording every litigant his/her day in court. Indeed, the Daniels Court concluded that the party against whom summary judgment is sought should be given the benefit of every reasonable doubt. Id.
¶ 10. Doe raises as her only assignment of error that defendants were improperly granted summary judgment because the lower court failed to properly consider the assailant Herrin's testimony. The trial court stated that Herrin's testimony was incredible and unreliable because
(1) when Michael Herrin confessed to the crime he told investigators he entered the plaintiff's apartment through an unlocked window; (2) during the sexual assault, Michael Herrin informed the plaintiff that he had entered her apartment through an unlocked window; (3) prior to giving his deposition, Michael Herrin had attempted to bargain with plaintiff's counsel whereby he offered to testify about the "pass" key in exchange for assistance with having his sentenced reduced; (4) Herrin perjured himself during his deposition when he denied that he had written plaintiff's counsel asking them to assist him to have his sentence reduced; and (5) when served with an order from this Court compelling Michael Herrin to produce the key, Michael Herrin informed this court by letter that he could not "produce a key which does not exist."
*205 (Footnote omitted.) Therefore, the court concluded that Herrin's testimony should be disregarded in its entirety and could not be used to create a genuine issue of material fact. The court cited Rucker v. Hopkins, 499 So.2d 766, 769 (Miss.1986), for the proposition that it could disregard Herrin's testimony because it is clearly and manifestly improbable and had been clearly impeached, and could not stand as a basis for a verdict in favor of the plaintiff. See also Jakup v. Lewis Grocer Co., 190 Miss. 444, 453, 200 So. 597, 600 (1941) ("We concur with the learned and experienced trial judge that the statement could not be safely accepted and acted upon. Courts are not required, they are not permitted, to lay aside common sense and the exercise of that critical judgment which years of experience with witnesses will produce, and accept as true any and every statement which some witness may be so bold as to make, simply because the witness, who has, in all reasonable probability, substituted an after-acquired imagination for facts, has sworn to it."); Truckers Exchange Bank v. Conroy, 190 Miss. 242, 199 So. 301 (1940) (holding that a jury should not be permitted to consider evidence where it is manifest that no reasonable man engaged in a search for truth, uninfluenced by proper motives or considerations would accept or act on the evidence); Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938) (holding that incredible testimony and the testimony of a plaintiff which was so clearly and manifestly improbable should be disregarded), cited in Rucker, 499 So.2d at 769-70.
¶ 11. This issue is one of first impression before this Court; we have never considered a situation in which a trial judge has excluded testimony of a fact witness in summary judgment. While it is true that this Court has held that there are instances in which judges are allowed to disregard or instruct against incredible and unreliable testimony at trial, this Court has never held similarly at the summary judgment stage in a proceeding. The case relied upon by the lower court, Rucker, involved a motion for a new trial or other relief after a jury verdict had already been rendered. Rucker was a wrongful death action wherein a fact witness gave a statement to law enforcement officers at the time of the accident inconsistent with one given at trial. On appeal to this Court, the defendants assigned as error the lower court's failure to grant a directed verdict after the witness' testimony was impeached. Id. at 768. This Court did not find reversible error, finding that a directed verdict would have been improper, despite the fact that the trial testimony had been impeached. Id. at 771. In doing so, the Court specifically acknowledged that there are times when a jury should be allowed to decide the issue of liability, even when the evidence is scant or the verdict contrary to the overwhelming weight of the evidence. Id. at 770.
¶ 12. Similarly, in this case, Herrin's testimony may be easily impeached, but that is an issue of credibility proper for determination by a jury, not by the trial court or this Court. Generally, prior inconsistent statements speak to the credibility or reliability of a witness's testimony but not to his/her ability or competency to testify. Indeed, this Court consistently holds that decisions as to the weight and credibility of a witness's statement are the proper province of the jury, not the judge. See Jackson v. Daley, 739 So.2d 1031, 1039 (Miss.1999) ("We have repeatedly held that the jury is responsible for judging the credibility of witnesses and the weight that should be attached to their testimony.").
¶ 13. There is no doubt that Michael Herrin has made contradictory statements in this case. Herrin's deposition and statement to the police that are a part of this record reveal that he is an habitual criminal who will serve his own interests above others whenever possible. Nevertheless, that fact alone does not make him incompetent to testify in this case, nor prevent his testimony from raising on behalf *206 of Doe a genuine issue of material fact.
¶ 14. Further, although Herrin's statements are contradictory, his letter to the trial judge was unauthenticated, unsworn, and has not been subject to cross-examination. To survive a motion for summary judgment, the party opposing the motion need only present a material issue of fact. In his only sworn statement to the court, Herrin testified that he had received a key to Doe's apartment from Betty Stegall and that he used that key to rob and rape Doe. When viewed in a light most favorable to Doe, that fact alone creates a genuine issue of material fact. Therefore, summary judgment should not have been granted.
¶ 15. While Herrin's testimony may easily be impeached at trial and it is possible this witness will do little to aid Doe's case, she should be allowed the opportunity to present her case.[2] Herrin may very well explain away his inconsistent statements.[3] In all but the most extraordinary of cases, a jury is best suited to determine the credibility of a witness.

CONCLUSION
¶ 16. Summary judgment should not have been granted in this case, nor the deposition testimony of Michael Herrin disregarded. Herrin's inconsistent statements point to the weight and credibility to be afforded his testimony, which are matters for the jury and do not prohibit the raising of a genuine issue of material fact so that Doe's claims survive summary judgment. The judgment of the Hinds County Circuit Court is reversed, and this case is remanded to that court for further proceedings consistent with this opinion.
¶ 17. REVERSED AND REMANDED.
PRATHER, C.J., BANKS, McRAE, SMITH, MILLS AND COBB, JJ., CONCUR. PITTMAN, P.J., NOT PARTICIPATING.
NOTES
[1] Interestingly, Michael Herrin was taken into custody by his bail bondsman shortly after his return to the apartment complex. For some reason on the very day that Herrin committed this crime, Herrin's bondsman had decided to relinquish the bond and return Herrin for another arraignment in Leflore County, where Herrin had been held in custody just prior to his taking up residence at Nottingham Place Apartments with his father. Herrin testified in his deposition that a Detective Seavey, from the Jackson Police Department, had arranged for his release from the Leflore County Sheriff's Office to work as a confidential informant to aid in drug busts. Herrin called Detective Seavey upon his arrival in Greenwood. It is unclear from this record how or why Herrin confessed to this crime, but his confession, made on the same day the crime was committed, is contained in the record.
[2] The Court does not intend to imply that Doe should be allowed to introduce Herrin's deposition testimony at trial without giving the defendants the opportunity to cross-examine Herrin in regard to Herrin's June 6, 1997, letter to the trial judge. In the event that Herrin should again refuse to testify under oath, the trial court is not precluded from refusing to allow Herrin's testimony to be presented. Doing so would not allow the defendants to examine the inconsistent statement contained in the letter to the trial judge. This Court further acknowledges the limited means available to the trial court in compelling Herrin's participation in this case.
[3] In his deposition, Herrin explained that he had lied to Doe and the police because he wished to give the key to a friend to complete his crimes and that he did not wish to be implicated if further crimes were committed. Not a very noble lie, but a logical one.