532 So.2d 592 (1988)
Roger Dale MONK
v.
STATE of Mississippi.
No. 58011.
Supreme Court of Mississippi.
October 12, 1988.
Rehearing Denied November 13, 1988.
*593 James G. McLemore, Jr., Morris C. Phillips, Jr., Wright & Phillips, Carthage, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ANDERSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Roger Dale Monk was convicted on October 9, 1986, in the circuit court of the First Judicial District of Harrison County upon a change of venue from Scott County under Miss. Code Ann. § 97-3-19(2)(f) (1972) of the capital murder of his step-daughter, six-month-old Rosa Marie Stephens, and sentenced to life imprisonment. Upon appeal he assigns the following errors:
I. THE TRIAL COURT ERRED IN REFUSING TO SUSTAIN APPELLANT'S DEMURRER TO THE INDICTMENT.
II. THE TRIAL COURT ERRED IN REFUSING APPELLANT'S REQUEST FOR PEREMPTORY INSTRUCTION D-1 REQUIRING THE JURY TO RETURN A VERDICT OF NOT GUILTY AND IN REFUSING HIS REQUEST FOR A NEW TRIAL.
III. THE TRIAL COURT ERRED IN REFUSING TO GRANT APPELLANT'S REQUEST FOR INSTRUCTION D-2.
IV. THE TRIAL COURT ERRED IN FAILING TO SUSTAIN APPELLANT'S OBJECTION TO THE ADMISSION OF THE TAPE RECORDING OF THE APPELLANT AND FURTHER THE TRIAL COURT ERRED IN REFUSING TO GRANT APPELLANTS MOTION FOR MISTRIAL.
V. THE TRIAL COURT ERRED IN REFUSING TO SUSTAIN APPELLANT'S OBJECTION TO CERTAIN *594 STATEMENTS MADE BY DISTRICT ATTORNEY TURNER DURING CLOSING ARGUMENT AND IN REFUSING TO GRANT APPELLANT'S MOTION FOR A MISTRIAL AND SUBSEQUENT MOTION FOR A NEW TRIAL?
VI. THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE PICTURES OF ROSA MARIE STEPHENS.
Finding these assignments to be without merit, we affirm.

FACTS
On May 31, 1986, Judy Stephens Monk (Judy) and Monk were married. Judy's daughter, Rosa Marie, also known as Rose, was born on January 7, 1986. The couple lived in a trailer approximately 100 yards from Monk's parents' home in the Sebastopol community of Scott County. The couple separated on Saturday, July 12, 1986, and Judy stayed at her parents' home until Wednesday, July 16, 1986. On this day while Judy and Rose were at the Public Health Department in Forest, where the baby received her six months' shot, Monk telephoned and left a message asking Judy to return his call. Consequently, the couple met later that evening at the home of Adeline Ferguson, a mutual friend, and agreed to resume co-habitation. The events occurring on the following Friday led to the death of Rose. On that Friday, July 18, 1986, Judy, Monk and Rose went to the home of Monk's mother, Bobby Jeannette Monk, to shell butter beans. While Judy remained at the home, Monk, his sister Ann Embry, her son Billy Paul and Rose rode to Forest to pick up Monk's paycheck. Monk, his sister and the two children returned to his mother's house around noon. Rose was later laid on a king-size bed and thereafter rolled off, striking the floor. Judy stayed with the baby to calm her, but noticed no bruises from this fall. Around 3:00 p.m. Monk took Rose to the trailer to feed her. Monk claimed that Judy was also present during this feeding. Judy, however, testified that Monk was alone with Rose and that when he returned to his mother's home with Rose her mouth was "puffed up." Monk said he thought the bottle he fed Rose could have caused this. Monk, Judy and Rose returned to the trailer around 6:30 p.m. Present at the trailer on this evening were Judy, Monk, Rose and Billy Paul. Rose fell asleep on a pallet in the living room and Judy left all three around 9:30 p.m. to take a bath. When Judy returned to the living room around 10:00 p.m., she noticed that Rose's face and hands had turned black. About this time Monk's brother Bobby, who was at his mother's house 100 yards away, came to the trailer. Bobby testified at trial that Monk had yelled for him from his trailer porch to come get Billy Paul. Judy testified that she did not hear anything while she was in the bathroom. Monk and Judy immediately took Rose to Thaggard's Hospital in Madden, and Judy attempted to perform cardiopulmonary respiration (CPR) on Rose during the car trip. At this time Rose's eyes were open and she was gasping for breath. At the hospital the nurses performed CPR and placed Rose on I.V. Zela McBeath, one of the attending nurses, stated that the baby arrived at the hospital with bruises. Dr. David Moody, the attending doctor at Thaggard's Hospital, stated that he initially thought the baby had been in a car accident. While at this hospital, Rose's face and mouth were cleaned off with Betadine or a similar antiseptic solution. Dr. Moody stated that when Rose arrived at the hospital she was flaccid, had fluid in her lungs causing her not to properly breathe, her pupils were constricted and she had decerebrate posturing (fingers and toes curled up and separated), leading him to believe that brain damage had occurred. Rose also had hypoxia, meaning that she was unable to receive oxygen properly. This condition causes the brain to swell and leads to brain damage. Rose was given Epinephrine sub-cutaneously, or through the skin, to help stimulate respiration, stimulate cardiac activity and to open up air passages to the lungs. She was also given Decadron to prevent brain swelling. Rose was placed on a ventilation tube to oxygenate her lungs, a nasal gastric *595 tube and had cardiac monitors placed on her chest to monitor her cardiac status. Rose arrived at the hospital with bruises on her neck and chest which were a few hours old. She also had a cut on her frenulum, or inner upper lip, which was actively bleeding and was also a few hours old. Medical personnel stated that Judy was hysterical and unable to talk to them, but that Monk was calm and told them that he had been holding the baby earlier when she went limp and stopped breathing. He also stated that the bruises were caused when the baby fell off the bed earlier in the day. Dr. Moody arranged for Rose to be flown to the Baptist Medical Center in Jackson where the baby died on Monday, July 21, 1986. Dr. Thomas Bennett, former State Medical Examiner, performed the autopsy on July 22, 1986. He observed multiple acute traumatic injuries which were caused by a blunt instrument (which includes the hands). Specifically, bruises were found on each side of the neck and on the chest. The frenulum was torn, swollen and surrounded by hemorrhage, which was also caused by a blunt instrument. Bruises on the chest were consistent with the baby having been held in a grasp and bruises on the neck were caused by a blow or squeezing force consistent with choking the child. Acute bronchial pneumonia was present and approximately 36 to 48 hours old, and was likely caused by the administration of CPR. Additionally, the area of the attachment of intestines to the spine was freshly torn, known as a mesenteric tear, and caused by a severe blow to the abdomen. A subdural hematoma (hemorrhage surrounding the brain) was present over both surfaces of the brain and was approximately one to two days old. Again, this was a result of a blunt trauma, specifically, extreme shaking of the infant causing the brain to shake inside the skull. Dr. Bennett stated that the cause of death was attributable to whiplash shaken infant syndrome in which a baby is held and forcefully shaken causing the head to literally whip. He further stated that the bruises on the chest and jaw were consistent with this shaking and that the bruises on the chest would correspond to where thumbs would be placed when holding the child. Testimony presented at trial showed that the baby had had trouble since birth with losing her breath and that Judy would shake the baby or blow in her face to help her catch her breath.
Monk testified and related the following events occurring on July 17 and 18. On Thursday, July 17, 1986, while he was watching Rose, he noticed bruises on the chest area and a swelling and redness of the lip. On Friday, July 18, 1986, Judy was present while he fed the baby during the afternoon. Later that night, while Judy was taking a bath, he picked up Rose when she began crying. While he was holding Rose in his lap, she started "drawing up." He immediately called for Judy and suggested that they go to the doctor. He stated that Judy then shook the baby before leaving for the hospital to help her catch her breath. He further testified he did not know when these injuries occurred and he did not notice any blood on or around Rose when they left for the hospital.
At the trial held on October 6-9, 1986, a portion of a tape made on July 3, 1986, of Monk threatening and yelling at Rose was played for the jury. The conversation is as follows:
MALE VOICE:
Son of a bitch, one of these days I'm going to hit you and see if you can squall.
FEMALE VOICE:
Oh, no, you're not.
MALE VOICE:
You watch. All she does is holler. Ain't never shedded [sic] a tear in this month we've been married.
FEMALE VOICE:
U-u-u-u-u.
MALE VOICE:
Don't say she has, because you know she ain't.
FEMALE VOICE:
I know she has.
MALE VOICE:
One of these days, she's going to be squalling, and I'm going to see just *596 how damn hard I can hit her to make her squall.
FEMALE VOICE:
Un-huh.
MALE VOICE:
To see her shed tears.
FEMALE VOICE:
Un-huh. Your dinner's in the refrigerator.
MALE VOICE:
Squall bag.
FEMALE VOICE:
Tell Daddy to shut up.
MALE VOICE:
I wish she would tell me that. You're going to keep  you're going to cause her to be a ass whipper. You watch! You're already starting it, and I ain't  I ain't  Tony's daddy  I ain't putting up with what Tony says. Tony tries (inaudible).
FEMALE VOICE:
She ain't going to start that.
MALE VOICE:
You keep (inaudible). And if its the first word she says, it will be the first ass whipping she gets, and you can take it any way you want to, a threat, a promise, whatever you want to. I've got it wrote down in my black book.
FEMALE VOICE:
What black book, Roger Dale?
MALE VOICE:
Dash this hot coffee on you and see if you squall.
FEMALE VOICE:
No, you will not. Roger Dale, you better not. If you do, I'm going to divorce the shit out of you, fixing to pour that hot coffee on that baby, or me, either one. Quit now!
MALE VOICE:
(Laughs) Yeah, I am.
FEMALE VOICE:
You ain't going to pour it on the baby.
MALE VOICE:
Dash it in your face. Believe me? Dare me? Dare me? Huh? Squall! Squall! You ain't doing your job right.
BABY CRYING
FEMALE VOICE:
Quit!
MALE VOICE:
Squall!
FEMALE VOICE:
Quit and leave her alone.
BABY CRYING
MALE VOICE:
Squall!
BABY CRYING
MALE VOICE:
(Laughs) That's all she's good for is turn her (inaudible) loose. Let her do what she can do the best.
FEMALE VOICE:
Ain't you, baby? Ain't that the truth?
MALE VOICE:

 Squall! Squall! Whaaa... . .
 whaaa... . . whaaa... . . whaaa... . .
 whaaa... . . whaaa... . . whaaa... . .

FEMALE VOICE:
Roger!
MALE VOICE:

 Whaaa... . . whaaa... . .
 whaaa... . . whaaa... . . whaaa... . .

BABY CRYING
MALE VOICE:
Whaaa... . . whaaa... . . Rose! Rose! Rose? Rose? Rose? What you squalling for? Stick it in your nose. I don't give a shit.
FEMALE VOICE:
Tell Daddy you know he don't give a stink.
MALE VOICE:
What? You don't know. You do everything but (inaudible) Huh! Squall bag!
(R-III, 554-556)
This tape was made by Judy as she was preparing to record songs. Later the same day Judy gave this tape to Adeline Ferguson, who had returned it to Judy at her request on July 20, 1986. Later in the day Judy gave the tape to her sister, Bonnie Pettus, who turned it over to the sheriff's department. All involved in the chain of custody testified that no alterations had been made to the tape. Monk stated that the voice on the tape sounded like his, but that he did not remember saying these *597 words. In a bifurcated trial Monk was convicted of the capital murder of Rosa Marie Stephens with the underlying felony of child abuse and was sentenced to life imprisonment in the Mississippi State Penitentiary. He now appeals.

LAW

I. DID THE TRIAL COURT ERR IN REFUSING TO SUSTAIN APPELLANT'S DEMURRER TO THE INDICTMENT?
Monk argues that his indictment failed to charge every material fact and essential element of the crime and, therefore, his demurrer to the indictment should have been sustained.[1] For this proposition he relies on Burchfield v. State, 277 So.2d 623 (Miss. 1973), which was decided prior to the adoption of the present rules and at a time when indictments were more closely scrutinized. Today the form as sufficiency of indictment is governed by Uniform Criminal Rules of Criminal Court 2.05:
RULE 2.05 FORM OF THE INDICTMENT
The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him. Formal or technical words are not necessary in an indictment, if the offense can be substantially described without them.
An indictment shall also include the following:
(1) The name of the accused;
(2) The date on which the indictment was filed in each court;
(3) A statement that the prosecution is brought in the name and by the authority of the State of Mississippi;
(4) The county and judicial district in which the indictment is brought;
(5) The date and if applicable the time, on which the offense was alleged to be committed. Failure to state the correct date shall not render the indictment insufficient;
(6) The signature of the foreman of the grand jury issuing it; and
(7) The words "against the peace and dignity of the state."
In the case of Harden v. State, 465 So.2d 321 (Miss. 1985), the defendant alleged that his indictment of attempted rape was defective for failing to allege an overt act. Id. at 323. This Court held that the indictment was not defective and stated the following:
[R]ule 205 requires notification in fact of the nature of the charge against the defendant and out of what transaction or occurrence it has arisen. If an indictment reasonably provides the accused this actual notice and includes the seven specific items enumerated in the rule, it is sufficient. Jones v. State, 461 So.2d 686, 693-694 (Miss. 1984); Thames v. State, 454 So.2d 486, 487 (Miss. 1984); Henderson v. State, 445 So.2d 1364, (Miss. 1984). [Emphasis original]
Id. at 324.
This indictment did contain the seven items enumerated in Rule 2.05. Consequently, the trial court did not err in failing *598 to sustain Monk's demurrer. Moreover, Monk's sentence to life imprisonment by the jury cured any complaint that he was not sufficiently charged with capital murder. See Miss. Code Ann. § 97-3-19(2)(f) (1972).

II. DID THE TRIAL COURT ERR IN REFUSING APPELLANT'S REQUEST FOR PEREMPTORY INSTRUCTION D-1 REQUIRING THE JURY TO RETURN A VERDICT OF NOT GUILTY AND IN REFUSING HIS REQUEST FOR A NEW TRIAL?

III. DID THE TRIAL COURT ERR IN REFUSING TO GRANT APPELLANT'S REQUEST FOR INSTRUCTION D-2?
These instructions stated:
INSTRUCTION D-1
The Court instructs the jury to return a verdict of not guilty.
INSTRUCTION D-2
The Court instructs the jury that you cannot find the Defendant guilty of Capital Murder.
In his brief Monk argues that there was no evidence to establish the underlying felony of child abuse and consequently the verdict was against the overwhelming weight of the evidence. He argues that the jury should have been required to find additional acts apart from those resulting in death in order to find him guilty of capital murder. He grounds this argument in the fact that there was no evidence of a series of abusive acts and that abuse cannot occur within 30 minutes, the amount of time during which Rose received the fatal injuries. Obviously, child abuse can occur within 30 minutes and often does. The statutes under which Monk was convicted state:
§ 97-3-19. Homicide; murder defined; capital murder.
* * * * * *
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
* * * * * *
(f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of section 97-5-39, or in any attempt to commit such felony.
§ 97-5-39. Contributing to the neglect or delinquency of a child; felonious abuse and/or battery of a child.
(2) Any person who shall intentionally burn or torture or, except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner so that any bone is fractured or any part of the body of such child is mutilated, disfigured or destroyed, shall be guilty of felonious abuse and/or battery of a child, and upon conviction may be punished by imprisonment in the penitentiary for not more than twenty (20) years.
There is no requirement in either statute that a pattern of child abuse must be established before a defendant can be said to have committed felony child abuse and the case of Faraga v. State, 514 So.2d 295 (Miss. 1987), answers Monk's contention to the contrary. In Faraga the defendant was also convicted of felony murder under Miss. Code Ann. § 97-3-19(2)(f). Id. at 301. Faraga argued that because there had been no showing of an independent act of child abuse or battery separate from the act which caused death, then there could be no felony murder conviction. Id. at 302. In finding this argument to be without merit, this Court stated:
[F]araga's act of throwing a child to the pavement which resulted in skull fractures and broken bones clearly was intended to be classified as felonious abuse of a child under Miss. Code Ann. § 97-5-39(2). This statute does not require that the abuse be dispensed over a period of time before a charge of felonious abuse will arise. Therefore, Faraga's argument that he was a "first time *599 child abuser" would not have prevented him from being punished under this statute had the infant lived. [Emphasis added]
Id. at 302.
Also, this Court in Faraga declined to adopt the felony murder doctrine and held that the underlying felony of child abuse does not merge with the murder. Id. at 302-03. Therefore, Monk's argument that there was no showing of felony child abuse is without merit. Further, there was ample evidence presented at trial from which a jury could conclude that Monk feloniously abused and/or battered Rose resulting in her death. Therefore, Instructions D-1 and D-2 were properly refused and a new trial was not warranted. See McAlpin v. McAlpin, 245 Miss. 25, 147 So.2d 623 (1962); Jakup v. Lewis Grocer Co., 190 Miss. 444, 200 So. 597 (1941). Moreover, this assignment of error was also cured by the jury's sentencing to life imprisonment. Miss. Code Ann. § 99-7-37.

IV. DID THE TRIAL COURT ERR IN FAILING TO SUSTAIN APPELLANT'S OBJECTION TO THE ADMISSION OF THE TAPE RECORDING OF A CONVERSATION BETWEEN HIMSELF AND HIS WIFE MADE ON THE MORNING OF JULY 3, 1986, AND FURTHER DID THE TRIAL COURT ERR IN REFUSING TO GRANT APPELLANT'S MOTION FOR MISTRIAL?
A trial judge has broad discretion as to the admission of evidence and unless he so abuses his discretion as to be prejudicial to the accused, his decision will not be reversed. Shearer v. State, 423 So.2d 824 (Miss. 1982). See also Dye v. State, 498 So.2d 343 (Miss. 1986). In Sparks v. State, 412 So.2d 754 (Miss. 1982), this Court held that before a sound recording may be admitted into evidence, the following factors must be established:
1. That the recording device was capable of taking testimony;
2. That the operator was competent;
3. That the recording is authentic and correct;
4. That there have been no changes, additions or deletions made to the tape;
5. The manner of preservation;
6. The identity of the speakers;
7. That the tape was voluntarily made.
See generally, 29 Am.Jur.2d Evidence, § 436 (1976).
During the trial Judy Monk testified that the tape recorder was working and capable of recording, that the tape recording was authentic, that she was competent to work the recorder, that there had been no deletions, additions or changes made and that the voices on the tape were of her, Rose and Monk. All of those involved in the chain of custody also testified that no changes or alterations had been made to the tape. Sheriff Glen Warren, who was the last to be in possession of the tape, testified that he kept the tape with him until the trial. He also testified that the male voice was that of Monk. The trial judge deleted a portion of the tape he found to be prejudicial and not probative. This deletion, however, in no way affected the admissibility of the recording. See Williamson v. State, 512 So.2d 868 (Miss. 1987). Prior to having the tape played for the jury, the trial judge instructed the jury to place on the recording as an exhibit "whatever value you deem it to have." A similar cautionary instruction was given in Dye v. State, supra. All the requisite factors for the admissibility of tape recordings were met and, therefore, the trial judge did not abuse his discretion. Accordingly, the defendant's motion for mistrial was properly overruled.

V. DID THE TRIAL COURT ERR IN REFUSING TO SUSTAIN APPELLANT'S OBJECTION TO CERTAIN STATEMENTS MADE BY DISTRICT ATTORNEY TURNER DURING CLOSING ARGUMENT AND IN REFUSING TO GRANT APPELLANT'S MOTION FOR A MISTRIAL AND SUBSEQUENT MOTION FOR A NEW TRIAL?
In his brief Monk argued that his objection to the following colloquy should have been sustained:

*600 BY MR. TURNER:
Now, I say shame on Roger Dale Monk for taking the life of that child. For whatever frustrations life has dealt him, shame on him for taking the life of a child six months old. But, even more, shame on us if we let him get away with it.
Consider this. If you find the Defendant not guilty, then by your verdict, you will have turned the key and opened the door and said, "Go on out in the world, Roger Dale Monk. Go on out there, and there are more babies out there. Reap whatever havoc your rage causes you to reap, and we will let you go."
Now, child abuse has become a national epidemic, but you, the jury, hold the prescription for that epidemic by finding a guilty verdict of capital murder. You can make a difference today by sending out a message that we are not going to sweep this kind of thing under the rug anymore. That's over.
Those of you who have children can sympathize with Judy Stephens Monk.
BY MR. PHILLIPS:
Objection, Your Honor. He is getting outside the evidence and the law in this case, and it is impermissible argument.
BY THE COURT:
I am going to overrule the objection. However, I am going to caution you to stay within the record and the inferences flowing from the record.
BY MR. TURNER:
Yes, sir.
BY MR. TURNER:
It is too late to help Judy Monk, and it's too late to help Rosa Stephens, but it is not too late to help others. You can make a difference by a verdict of guilty of capital murder.
BY MR. PHILLIPS:
Objection, Your Honor. He is outside the evidence and the law on this case.
BY THE COURT:
Overruled.
BY MR. PHILLIPS:
Move for a new trial.
BY THE COURT:
Overruled.
BY MR. TURNER:
Now, let's ask this question. What difference will your guilty verdict make? First of all, it will keep Roger Dale Monk out of society where he cannot do this kind of damage to any other little children.
Secondly, it will punish him for the atrocious crime that he has committed.
Thirdly, it will protect others from him, from him doing that to anyone else, and lastly, and perhaps most important, it will deter other people who hear about this that might be inclined to commit this kind of crime, because you will send a message that in Harrison County, or in Scott County or in any county in the State of Mississippi, you will never ever condone this type of action in our Court system or in our society.
If by your verdict, one small child is saved, you will have done your job. Now, we are fighting child abuse as hard as we know how. The law enforcement officers in this case have done an excellent job.
BY MR. PHILLIPS:
Objection, Your Honor. We are outside the law and the inferences in this case. He is making a speech.
BY THE COURT:
Overruled.
(R-V, 833-836)
A contemporaneous objection must be made to allegedly erroneous comments made during closing argument or the point is waived. See Gray v. State, 487 So.2d 1304 (Miss. 1986); Shavers v. State, 455 So.2d 1299 (Miss. 1984). See also Baker v. State, 327 So.2d 288 (Miss. 1976). However, "if a comment is so inflammatory that the trial court should have objected on his own motion, the point may be considered." Gray, supra, at 1312. See also Clemons v. State, 320 So.2d 368 (Miss. 1975). The reasoning behind the requirement of contemporaneous objections is to *601 allow the trial court to correct the error with proper jury instructions. Baker, supra. In discussing the purpose and limits of closing arguments, the following is stated in 23A C.J.S. Criminal Law, § 1090 (1961):
Generally, improper remarks or argument to jury should scrupulously be avoided by all attorneys. The rule that it is always the duty of the prosecuting attorney to treat accused in a fair and impartial manner applies to his conduct and arguments to the jury, and the rights of the accused cannot be prejudiced by improper remarks. It is sometimes difficult, however, to draw the line between allowable argument and improper statements in argument, because the prosecuting attorney and also the counsel for accused, has of necessity much latitude in the language or manner of presenting his side of the case consistent with the facts in evidence.
The right of argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel's argument is within the limits of proper debate it is immaterial whether it is sound or unsound, or whether he employs wit, invective, and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of debate, which, although not legitimate, are generally disregarded by the court, because in its opinion they are harmless. There are, however, certain well-established limits beyond which counsel is forbidden to go; he must confine himself to the facts introduced in evidence and to the fair and reasonable deductions and conclusions to be drawn therefrom, and to the application of the law, as given by the court, to the facts. [Emphasis added]
See also, Bullock v. State, 391 So.2d 601 (Miss. 1981).
Additionally, in the case of Neal v. State, 451 So.2d 743 (Miss. 1984), this Court stated that a prosecuting attorney is entitled to great latitude in framing the closing argument as long as no impermissible factor is argued, such as the defendant's failure to take the stand. Id. at 762. Likewise, this Court held in Carleton v. State, 425 So.2d 1036 (Miss. 1983), that remarks made by the prosecuting attorney during closing argument in a murder trial asking the jury to send a message to "let people know what the people of Harrison County stand for" was not improper. Id. at 1039.
However, in the case of Bridgeforth v. State, 498 So.2d 796 (Miss. 1986), this Court held that the objection to the closing argument during which the prosecution referred to the defendant as "scum" should have been sustained because this amounted to personal abuse and vilification and was inflammatory. Id. at 801. Although it is sometimes difficult to draw a line between permissible comments and impermissible comments, we find the district attorney's comments were not such as to require reversal.

VI. DID THE TRIAL COURT ERR IN ALLOWING INTO EVIDENCE PICTURES OF ROSA MARIE STEPHENS?
The admission of photographs into evidence is left up to the sound discretion of the trial judge and will not be disturbed unless the judge has abused his discretion. See Wetz v. State, 503 So.2d 803 (Miss. 1987); Hubbard v. State, 437 So.2d 430 (Miss. 1983). In Wetz, supra, the defendant was convicted under Miss. Code Ann. § 97-3-19(1)(a) of the capital murder of his seven-month-old daughter. Id. at 805. Presented at trial were photographs of the child taken while being treated in the emergency room. Id. at 812. The defendant argued that these photographs had no probative value because they showed her with Merthiolate on her body, giving a more severe appearance than was actual. Id. Likewise, Monk objects to the photographs of Rose being treated in Thaggard's Hospital with Betadine or a similar solution on her body and hooked up to life support systems. This Court in Wetz, supra, held that photographs were admissible as probative evidence for four reasons:

*602 [F]irst, they were properly admitted to show the condition of Kristina immediately after the incident. Price v. State, 54 So.2d 667 (Miss. 1951). Second, they portray pictorially the extent of the head and facial trauma observed by the witnesses and described by Dr. Sheffield, the attending physician. Third, the pictures had the potential clarification, or making more certain, that which occurred. King v. State, 408 So.2d 1375, 1376 (Miss. 1982). Finally, the photographs depicted the multiple bruises on Kristina's head which were evidence of malice, an essential ingredient of the crime charged, and were thus needed to refute Wetz' Weathersby [v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933)] defense. Therefore, the Circuit Court did not abuse its discretion in admitting these pictures into evidence. Martin v. State, 354 So.2d 1114, 1118 (Miss. 1978) (no abuse of discretion by admitting photographs in child abuse case where pictures of deceased child showed bruises, contusions and injuries on the body); Tapp v. State, 347 So.2d 974, 977 (Miss. 1977) (no abuse of discretion by admitting photographs of child abuse case where pictures reflected bruises and marks on child's body); Cardwell v. State, 461 So.2d 754, 760 (Miss. 1984) (same).
503 So.2d at 812. See also Swanier v. State, 473 So.2d 180 (Miss. 1985); Roberts v. State, 458 So.2d 719 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983).
Similarly, the photographs of Rose accurately depicted the bruises on her neck and chest and cut on her inner lip and consequently were of probative value particularly in the light of Monk's assertion that the child simply went limp while he held her and that no blood was present before they left for the hospital. Consequently, the trial court did not abuse its discretion in admitting these photographs into evidence.
Finding no error, we affirm
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] The indictment reads:

THE GRAND JURORS of the State of Mississippi, taken from the body of the good and lawful persons of the County of Scott, duly elected, empanelled, sworn and charged, at the Term aforesaid of the Court aforesaid, to inquire in and for the body of the County aforesaid, in the name and by the authority of the State of Mississippi, upon their oaths present: That Roger Dale Monk late of the County aforesaid, on or about the ____ [sic] day of July in the year of our Lord, 1986, in the County and State aforesaid, and within the jurisdiction of this Court did then and there without authority of law willfully, feloniously and of his malice aforethought kill and murder Rosa Stephens, a human being and a child under the age of one year, while he, the said Roger Dale Monk was then and there engaged in the commission of the crime of felonious abuse and battery of Rosa Stephens, by the said Roger Dale Monk then and there feloniously and intentionally striking, choking, shaking and abusing Rosa Stephens in such a manner that the face, neck and body of Rosa Stephens were bruised and disfigured contrary to and in violation of Section 97-3-19(2)(f), Miss. Code Ann. (1972) as Amended, against the peace and dignity of the State of Mississippi.