981 So.2d 320 (2007)
Towander Denise BROADHEAD a/k/a Towanda Denise Garner a/k/a Tawana Denise Broadhead, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-02063-COA.
Court of Appeals of Mississippi.
December 4, 2007.
Rehearing Denied March 11, 2008.
*321 George T. Holmes, Jackson, attorney for appellant.
Office of the Attorney General by Deshun Terrell Martin, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Following a jury trial, Towander Denise Broadhead was convicted of the capital murder of her five-year old son, Kenderick Broadhead. After finding Broadhead guilty of capital murder, the jury was unable to come to a unanimous decision regarding whether to sentence Broadhead to death. Therefore, the Jackson County Circuit Court sentenced Broadhead to a term of life in the custody of the Mississippi Department of Corrections, with no possibility of parole or early release. Aggrieved, Broadhead appeals and alleges that the court erred in allowing the admission of autopsy photographs and in allowing the admission of a recorded telephone conversation between Broadhead and another individual.
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. On Sunday, February 29, 2004, Broadhead was attempting to teach Kenderick *322 to count from one to twenty. However, Kenderick kept skipping the number sixteen. As a result, Broadhead began hitting Kenderick. The assault apparently continued, perhaps intermittently, for four to six hours, with a variety of implements used to beat Kenderick. Eventually, multiple injuries to Kenderick's head caused his brain to swell massively, ultimately causing him to stop breathing. At the end of the assault, Broadhead placed Kenderick in his sister's bed because Broadhead had noticed that Kenderick appeared to be sleepy. It is unclear whether Kenderick was already dead when he was placed in the bed. Kenderick's sister, Royteshia Perkins,[1] was home on February 29 and observed Broadhead beating Kenderick throughout the day.
¶ 4. At some point after Kenderick died, Broadhead called her husband at the time, Willie Thomas.[2] Thomas was at work, but he came home to inspect Kenderick. After observing Kenderick, who was in Royteshia's bed and who apparently was already dead, Thomas decided to purchase a stethoscope so that he could see if Kenderick was actually dead. Royteshia and Thomas left and purchased a stethoscope. After returning and using the stethoscope, Thomas was apparently convinced that Kenderick was dead. Sometime thereafter, Thomas and Broadhead rolled Kenderick's body up in a rug and placed it in two black plastic garbage bags.[3] Thomas and Broadhead then drove approximately forty-five miles away, where they dumped Kenderick's body on the side of a road.
¶ 5. The above recitation of facts is relatively undisputed. The only significant conflict presented in the evidence was how severely Broadhead beat Kenderick.
¶ 6. At trial, Officer Ken McClenic, of the Jackson County Sheriff's Department, Royteshia, and Dr. Paul McGarry, among others, testified on behalf of the State. The State also played Broadhead's videotaped statement to Officer McClenic and a recorded phone call that Broadhead made from jail. A 911 call that Broadhead placed on March 2 was also played for the jury.
¶ 7. Broadhead testified in her own defense and admitted, as she had done during an interview with the police prior to trial, that she beat Kenderick.[4] However, she downplayed the severity of the beating, accused Officer McClenic of altering the videotape of her confession to him, and blamed the devil for forcing her "flesh" to beat Kenderick. Royteshia testified that Broadhead beat Kenderick with her hand, a book, a curtain opener, and a broomstick. Royteshia specified that some of these blows landed on Kenderick's head, and that the beatings continued for many hours, all over the house. Royteshia also described a car ride on the 29th during which Broadhead repeatedly pushed Kendrick's head into the car door when he was unable to properly count to twenty. Royteshia told the jury that, after the beatings, Kenderick had trouble walking and talking. Dr. McGarry, the pathologist who conducted Kenderick's autopsy, testified that as Kenderick's brain swelled, he would have had increasing difficulty walking *323 and talking. Broadhead testified, by contrast, that Kenderick never displayed any difficulty walking or talking. Broadhead also disputed the severity and number of blows that she delivered. She further denied shoving Kenderick's head into the car door when he was unable to count during the car ride.
¶ 8. Royteshia testified that she knew Kenderick had died when he coughed and stopped breathing during the evening. She testified that Broadhead then told her to get some alcohol and something to drink. Royteshia testified that she then brought Broadhead some rubbing alcohol and lemonade. Royteshia stated that she watched as Broadhead rubbed Kenderick's body down with the alcohol and attempted to get him to drink the lemonade. Broadhead admitted rubbing Kenderick down with alcohol, but could not recall trying to get him to drink something. Broadhead also did not remember any particular moment when Kenderick died. She testified that she believed that Kenderick was still alive when she placed him in Royteshia's bed.
¶ 9. Broadhead also claimed that she attempted to perform CPR on Kenderick. By contrast, Royteshia testified that it was Thomas who attempted to resuscitate Kenderick. Royteshia testified that when he did so, Kenderick urinated on himself and blood came out of his nose. Royteshia believed that Kenderick was already dead by that time because she had touched his body and it was cold. Broadhead allegedly believed that Kenderick was still alive, in part because he urinated on the bed. As previously stated, it is undisputed that everyone in the house realized at some point that Kenderick was dead. Broadhead and Thomas then disposed of his body.
¶ 10. Royteshia did not attend school on Monday, March 1, but attended school on Tuesday, March 2. Broadhead told Royteshia to tell anyone who asked that she had seen Kenderick that morning as she left for school. Shortly after Royteshia left for school, Broadhead called 911 and informed the operator that her son, Kenderick, was missing. Law enforcement was sent to the residence, and a massive search ensued. Broadhead told police officers that she knew Kenderick had been there that morning because she had heard Royteshia say goodbye to him. Believing that Royteshia was the last person to see Kenderick that morning, Officer McClenic went to Royteshia's school to interview her.
¶ 11. Royteshia was taken out of class and interviewed. She initially stuck to the story that Broadhead had told her to say. Eventually, however, she related what had really happened. At that time, Officer McClenic phoned officers who were at the house and had Thomas and Broadhead taken into custody. Shortly thereafter, Thomas gave a statement to police essentially admitting what had happened, including the location of Kenderick's body. That evening, officers went to the location and discovered Kenderick's body, still wrapped in a rug and garbage bags. After a brief on-the-site investigation, Kenderick's body was taken to a nearby funeral home where an autopsy was performed.
¶ 12. Broadhead was interviewed by Officer McClenic late that night. After waiving her Miranda rights, she told Officer McClenic that she grew angry with Kenderick after he kept missing the number sixteen in his counting. She admitted to hitting Kenderick, although she stated at times that she had not hit him very hard. She told Officer McClenic at some point that she had not hit Kenderick with a broomstick, but only with the bristles of the broom. She later contradicted this when she admitted that she had hit Kenderick with the broomstick itself. She *324 stated that she believed Kenderick was asleep when she put him in Royteshia's bed. She also admitted to Thomas's involvement with disposing of Kenderick's body.
¶ 13. On March 6, 2004, the same day as Kenderick's funeral, Broadhead placed a phone call from jail to a man named Cliff. A recorded message informed both her and Cliff that the phone call would be recorded. During the call, which was played for the jury, Broadhead admitted to killing Kenderick. She asked Cliff, who apparently was a paramour of sorts, whether he would still want to be with her, knowing what she had done to her child.
¶ 14. After hearing all the evidence, the jury found Broadhead guilty of capital murder. During sentencing deliberations, one juror refused to vote in favor of the death penalty. Unable to return a unanimous decision as to the death penalty, the jury informed the court that it was deadlocked as to the issue of punishment. The court therefore sentenced Broadhead to life in prison.
¶ 15. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Admission of Autopsy Photographs
¶ 16. Broadhead contends that the court erred in admitting Exhibits 40 and 41. Exhibit 40 is a photograph of Kenderick's dissected chest during the autopsy. Exhibit 41 is a photograph of his skull with the skin deflected during the autopsy to show the severity of the injuries to his brain.
¶ 17. Broadhead contends that "[t]here is no way for the jury to differentiate any subdural bleeding from bleeding caused by the autopsy incision." At trial, Dr. McGarry testified that the blood seen in the pictures was caused by the assault on Kenderick and the massive bruising that resulted therefrom. This testimony went uncontested, and there was no testimony that an "autopsy incision" could have caused the bleeding shown in the pictures. Therefore, this specific contention is wholly without merit.
¶ 18. Broadhead further contends that the only purpose of the pictures was to arouse the sympathy of the jury. We find Bennett v. State, 933 So.2d 930 (Miss.2006) particularly helpful in resolving this issue. As in the case before us, Bennett involved the death of a young child. Id. at 934-36 (¶¶ 2-8). Like Broadhead, the defendant in Bennett did not deny that some trauma had happened to the victim. Id. at 936(¶ 9). Instead, his story was that he had caused only minor injuries to the victim. Id. This testimony was in direct contradiction to the testimony of the State's experts, who testified that the injuries that caused the victim's death could not have been caused by the incidents related by the defendant. Id. at 936-37 (¶¶ 11-12). Instead, more force had to have been applied in order to cause the severity of the injuries. Id. Photographs were admitted to show the extent of the victim's injuries, including a photograph of the "specific internal injuries on the left side of [the victim]'s head which appeared as a large collection of blood in the scalp area. . . ." Id. at 945(¶ 52). This description is nearly identical to the summarization of what was shown in the photographs at issue here.
¶ 19. In affirming the court's admission of the autopsy photographs in Bennett, the Mississippi Supreme Court explained:
Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are *325 admissible before a jury. Neal v. State, 805 So.2d 520, 524 (Miss.2002). Admission of photos of a deceased is within the sound discretion of a trial court and is proper so long as the photos serve some useful, evidentiary purpose. (citations omitted). The discretion of a trial judge to admit photos in criminal cases "`runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value.'" Woodward v. State, 726 So.2d 524, 535 (Miss.1997).
Id. at 946(¶ 53).
¶ 20. Like the Bennett court, we find that the photographs here were of significant probative value, especially in light of the conflicting versions told of Kenderick's beating. During her initial account of the events during direct examination, Broadhead claimed that she had hit Kenderick with her hand and a belt, but that she had only "popped" him once with a stick. During cross-examination, Broadhead and the prosecutor had the following exchange:
Q. Did you beat him to death, ma'am, is my question.
A. I don't know how to answer that one.
Q. Well, it's a yes or no answer.
A. I was overpowered by my flesh, sir.
Q. Your flesh made you kill son [sic]?
A. Uh-huh. Romans 8:5. Verse 6 says that.
* * * *
Q. And when you beat him with your hand, when you beat him with the belt, when you beat him with the stick, you were helping him? I just want to make sure I understand you.
A. I was fooled to believe that I was doing that.
* * * *
Q. You thought it would help you to beat your son to death?
A. It helped me.
Q. It helped you?
A. That's what I thought.
Q. It didn't help Kenderick, did it?
A. I know.
Q. Did it?
A. And I'm the only one that had to suffer for that. Me.
Q. Did it help Kenderick?
A. No.
* * * *
Q. Okay. You hit him in the face to cause black eyes, busted lip, swollen nose. Yes, ma'am or no, ma'am?
A. Yes.
Q. And you hit him in the head on the left side of his head?
A. When I was doing all those types of things to him, it wasn't because I hate him.
* * * *
Q. Okay. And it was the broomstick that you used to hit him in the head with?
A. Later on that night.
Q. Okay. I just want to, again, make sure I understand. You admit to using your hand, a belt and a broomstick to administer punishment?
A. Yes.
¶ 21. Broadhead specifically rejected Royteshia's testimony that Broadhead shoved Kenderick's head against the car door when he could not properly count in the car. She also denied that Kenderick had ever attempted to defend himself against her assault, whereas Dr. McGarry *326 found that some of the wounds on Kenderick's hands and arms indicated that he attempted to fend off his attacker as he was beaten. During her statement to police, Broadhead at one point indicated that she merely "swatted at" Kenderick with her broom. At no time did Broadhead ever admit that she had beaten Kenderick as severely as Royteshia claimed she did. Broadhead waffled between claiming that she had hit Kenderick, but not very much or very hard, and admitting that she had hit him with several different objects, including hitting him in the head with a broomstick. Dr. McGarry testified that there was a "massive area of dark purple discoloration [shown in one of the autopsy photographs] where many blows have been delivered against the left side of his head, neck, shoulder, upper chest in such a way that they are overlapping." (emphasis added).
¶ 22. The photographs clarified exactly what happened to Kenderick in that they show the incredible severity of the beating that Kenderick suffered before he died. Dr. McGarry explained to the jury what Exhibit 40, the photograph of Kenderick's chest, showed: "you can see that there's massive hemorrhage. All of that dark area is fresh blood beneath the skin. The tissue has been so severely injured that the blood vessels have been ripped open, torn open . . . that's what causes the purple discoloration through the skin that you can see from the outside." The importance of Exhibit 41, which showed the injury to Kendrick's brain, was also explained by Dr. McGarry:
[A]ll of this dark discoloration that you see . . . are areas where the skin has been struck with such force as to tear the blood vessels beneath, causing bleeding into the soft tissues under the skin. . . . At first, they are separate areas of bleeding, outlining a blow. And then, as the bleeding progresses, they come together and overlap each other so that the whole side of the head is discolored and swollen.
¶ 23. The photographs unequivocally corroborated Royteshia's testimony and the findings of Dr. McGarry. They helped clarify what parts of Broadhead's testimony were true and which were not. The photographs' probative value clearly outweighed their prejudicial effect, and the court did not err in admitting them.
2. Admission of Audio Recording of Telephone Conversation
¶ 24. Broadhead essentially claims that the court erred in admitting the recording of her phone call from jail because the State's attempt to authenticate the recording was insufficient. Rule 901(a) of the Mississippi Rules of Evidence states that authentication of a piece of evidence is sufficient for admission when it "support[s] a finding that the matter in question is what the proponent claims." Several examples follow this general statement. Rule 901(b)(5) says the following would be sufficient for authentication of a voice identification: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." The rule then goes on to state that authentication of a telephone conversation is sufficient when there is "evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called. . . ." M.R.E. 901(b)(6). Rule 901(b)(9) gives an example of sufficient authentication for a system or process: "Evidence describing a process or system used to produce a result and showing that *327 the process or system produces an accurate result."
¶ 25. Detective Richard Raider of the Jackson County Sheriff's Department testified that he was familiar with Broadhead's voice and that it was clearly her voice on the recording. In addition, Broadhead identified herself at the beginning of the phone call when it asked her to identify the source of the collect call. Furthermore, Detective Raider testified that he was familiar with the phone system that recorded the inmates' phone calls, although he was not responsible for the phone system at the time of Broadhead's call. Under the standard given in Rule 901, this evidence was sufficient to authenticate the recording, and there was no error in admitting the recording. Additionally, Broadhead's attorney did not object to the admission of the recording on the basis of authentication. Instead, Broadhead's attorney merely stated that "we think that whoever was in charge ought to be able to testify." When asked by the court whether that was the basis of his objection, Broadhead's attorney responded: "We object to it, Your Honor." Therefore, even when given the chance to object to the recording on the basis of its authentication, Broadhead's attorney did not do so.
¶ 26. As support, Broadhead cites Conway v. State, 915 So.2d 521 (Miss.Ct.App. 2005). In Conway, this Court found that an edited videotape was not properly authenticated where the officer whose testimony was used to authenticate the footage never actually witnessed the crime scene. Id. at 526(¶ 19). Nevertheless, we found that the admission of the videotape was harmless error in light of the overwhelming evidence against Conway. Id. at 526(¶ 20). We find Conway inapplicable to the situation before us. Detective Raider testified that he was familiar with Broadhead's voice and that it was her voice on the recording. Detective Raider also testified that he was familiar with the phone system that records inmate calls and how that system works. Conway is clearly distinguishable from the present case.
¶ 27. Furthermore, as in Conway, the evidence against Broadhead is overwhelming. Therefore, even if there were any error on the court's part in admitting the tape, that error would be harmless. In our view, it is debatable whether the audio recording in question contained any more incriminating information than what Broadhead gave in her statement to police and on the stand at trial. There was a passing mention of Broadhead having been in trouble with the law as a juvenile, but the statements she made with respect to Kenderick were essentially no worse than her other statements. Broadhead admitted to the person she was speaking to that she had killed her child; however, Broadhead essentially admitted this both in her statement to police and at trial. No evidence whatsoever was ever offered to indicate that someone other than Broadhead beat Kenderick.
¶ 28. During her statement to police, which has not been challenged on appeal, Broadhead essentially admitted that she beat Kenderick to death. We quote some of the pertinent parts of her statement:
Q. So you got more  first, you was [sic] aggravated because he couldn't count to  he wouldn't say 16. But then you got more mad when you broke your broomstick?
A. When I broke my broom, that made me mad. But I beat him to death because he was  I made him stand in the corner, so that's what happened.

*328 * * * *
Q. So, by this point, you knew that he was already dead in the bed, right?
A. Uh-uh. I just knew he was asleep in the bed.
Q. Did you think he was dying or 
A. Uh-uh. I didn't think. I didn't want to disturb him, either, so I wanted Willie to come and, you know  and I didn't want to call the police because I knew I was going to go to jail.

* * * *
Q. All right. So when he wouldn't say 16, he didn't know to say 16, right?
A. Uh-huh. He knew it come after. He was just playing saying 16. Then we'd get to 16, he'd say 17. And that was just aggravating me. Now, I know  I can't believe this happened.
Q. Him not saying 16 aggravated you enough to make you beat him hard enough to kill him?
A. (Nodding head affirmatively).
* * * *
A. I'm bad because of this, because I beat my baby until I beat him to death. I know considering he was bad, but I'm not a 
(emphasis added).
¶ 29. Never did Broadhead offer an alternative hypothesis as to what caused the massive injuries that Kenderick sustained. In fact, Broadhead and the prosecutor shared the following exchange during her cross-examination:
Q. So, did you or did you not kill your son on February 29, 2004? Yes or no?
A. I'm saying that my flesh overpowered me and I was disassociated from my body that day.
Q. And I guess Ken McClenic forced your flesh to make you kill your son on the 29th?
A. No. The stronghold that Satan was working from in my mind, by me being slow. And it was important that he have to stand out because he a person [sic] and I love him, and to let me know I finally did something right, yeah, that's all I was trying to do.
While she refused to admit that she killed her son of her own free will, instead blaming Kenderick's beating on Satan, Broadhead essentially admitted that she killed Kenderick. When given the clear opportunity to state that someone else had killed Kenderick or participated in his beating, Broadhead did not do so. Furthermore, she admitted to police that she killed Kenderick without attempting to blame the murder on Satan.
¶ 30. The defense theory expounded by Broadhead's counsel in closing argument was essentially that Broadhead did not realize how severely she had beaten Kenderick because she had been hit with a lead pipe by her own mother and shot at at some point. Never did her counsel attempt to argue that someone else had beaten Kenderick. Therefore, Broadhead's own closing argument admitted as much of her guilt as did the recorded conversation.
¶ 31. Broadhead also intimates that the court erred in allowing the transcript of the recording into evidence because the parties had not agreed regarding the accuracy of the transcription. This was hashed out below when Broadhead's attorney suggested that it was possible that the transcriber had made an error in the transcription. The State then offered an original of *329 the recording to Broadhead's attorney, and no further objection was lodged regarding the accuracy of the transcription. Clearly, the court did not err in allowing the transcript. Although she does not raise it as an assertion of error, Broadhead also suggests that, pursuant to Monk v. State, 532 So.2d 592, 599 (Miss.1988), a cautionary instruction should have been given to the jury regarding the transcript. However, no cautionary instruction was requested in the current case. The court did not err in failing to grant such an instruction sua sponte. Nothing in Monk indicates that an instruction must be given even where a party does not request one.
¶ 32. Under the circumstances, and given the overwhelming weight of the evidence against Broadhead, we cannot find that Broadhead is entitled to a new trial due to the court's admission of the videotape. We find no error on the court's part, but even if we did, such error would be harmless at worst.
¶ 33. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JACKSON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Royteshia is Broadhead's child from a previous relationship.
[2] Thomas died before trial and the court refused to allow the State to play a videotaped statement by Thomas taken prior to his death.
[3] Broadhead essentially testified that she was with Thomas as he rolled up Kenderick's body and disposed of it, but she testified that she did not personally carry Kenderick's body.
[4] The contents of the interview are discussed in more detail later in this opinion.