# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01567-SCT

*TAMMY WATKINS, ON BEHALF OF THE*
*WRONGFUL DEATH HEIRS OF AUSTIN JAMES*
*WATKINS*

*v.*

*MISSISSIPPI DEPARTMENT OF HUMAN*
*SERVICES*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/18/2012 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOSEPH E. ROBERTS, JR. |
| | EUGENE COURSEY TULLOS |
| ATTORNEY FOR APPELLEE: | ROBERT E. SANDERS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 02/27/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.

### KING, JUSTICE, FOR THE COURT:

¶1.     In this wrongful-death suit against the Mississippi Department of Human Services (DHS), a mother sued DHS after the death of her son in the home in which DHS placed him. The trial court granted DHS's motion for summary judgment, determining that DHS enjoyed sovereign immunity from liability for the acts alleged in the complaint. Because summary judgment was improvidently granted, this Court reverses the trial court and remands the case for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.     This case involves a child, Austin Watkins, whom DHS removed from the home of his mother, Tammy Watkins, and placed in the home of his paternal grandmother, Janice Mowdy.  Approximately a year and a half after Mowdy was awarded durable legal custody of Austin, Austin died from starvation.  This wrongful-death lawsuit followed.

¶3.     On July 26, 2005, DHS removed Tammy Watkins's children, Austin and his siblings Tom and Abby,[1] from her home.  That same day, the Youth Court of Scott County entered a custody order granting DHS custody of Austin.  In August 2005, DHS conducted a home study for Mowdy to determine whether Austin and Tom, her grandsons, could be placed with her.[2]  In the home study form, the section for references for Mowdy was left blank.[3]  Ultimately, in late August 2005, DHS placed all three children with Mowdy, who lived with her fourth husband and her adult daughter, Stephanie Bell.  On April 24, 2007, Mowdy was awarded durable legal custody of Austin, Tom, and Abby. DHS did a final home visit on April 27, 2007, and did a closing summary in the case on May 10, 2007.

¶4.     Mowdy brought Austin to the University of Mississippi Medical Center (UMC) on June 10, 2007.  He was three-and-one-half years old at the time and weighed just twenty-four pounds.  He was experiencing extreme swelling.  It was determined upon admission to the

---

[1]The names of Austin's siblings have been changed to protect their identities.

[2]Abby is not Mowdy's grandchild, but at the home visit, Mowdy expressed interest in having Abby live with her, too.  DHS approved placing Abby with Mowdy.

[3]Valerie Grisele with DHS testified that DHS (specifically Donna Wallace) spoke to Mowdy's references.  However, she could not recall who the references were.  Mowdy testified that she gave DHS three references, and she then named them.

hospital that Austin suffered from severe dehydration and malnutrition. During his hospital stay, UMC ran countless tests on Austin. Ultimately, "no organic cause could be found" for Austin's malnourishment, so "inorganic/social reasons were then investigated." Thus, "his placement with his paternal [grandmother] [was] questioned to DHS."

¶5.     On June 25, 2007, Dr. Johnny Byrnes, a resident assigned to Austin's case, called UMC social worker Kathy Dennis because Mowdy was attempting to take Austin from the hospital against medical advice. Dennis and Byrnes called Scott County DHS and spoke to Heather Russell, the social worker who had closed out Austin's case. In his deposition, Dr. Byrnes testified that he told Russell that "the medical staff felt that the family either was not feeding him or did not know how to properly feed him." According to Dennis's notes, Russell told them that she felt Mowdy was an appropriate caregiver and that she would follow up with Austin once he got home. Dennis noted that she and Dr. Byrnes thought that Russell did not fully appreciate Austin's medical condition and why he should not go home.

¶6.     On June 27, 2007, UMC social worker Gayden Carpenter received a call from Austin's nurses because they were concerned that he was being abused at home. Austin was evaluated by a child psychologist, who determined that Austin displayed no evidence of ongoing abuse. Nonetheless, Carpenter contacted Russell, who denied concerns of abuse. Austin was discharged in July 2007, having greatly improved and weighing twenty-eight pounds, simply from being properly fed. He had a follow-up on July 17, 2007, at which it was noted that he was much improved. He had another follow-up appointment in August of 2007, which he missed. He missed all subsequent follow-up appointments, as well.

3

¶7.     On November 9, 2008, Austin passed away, just six days before his fifth birthday, weighing a mere nineteen pounds.  His official cause of death was starvation and dehydration, and the manner of death was homicide.  Mowdy and Bell ultimately pled guilty to capital murder for murdering Austin while engaged in felonious child abuse.

¶8.     On January 5, 2009, the Attorney General appointed special assistant attorneys general to review the circumstances surrounding Austin's death.  The review "was conducted to determine what improvements the State could make to prevent the next child from dying of starvation, or other forms of abuse and neglect."  Included in the "Social Autopsy" produced from the review were notes from an interview with Jennifer Watkins, a paternal aunt of Austin's.   Jennifer claimed that she anonymously called DHS in June 2007 and reported to Heather Russell that Austin looked gray, weak, and skinny.  She reported that Russell told her they would look into it.  This "report" was included in the factual "Timeline" in the Social Autopsy.

¶9.     On April 30, 2010, Tammy, on behalf of the wrongful-death heirs of Austin, filed suit against DHS alleging that DHS's negligence caused Austin's death.  DHS answered, and discovery began.  During discovery, the parties deposed multiple people involved with Austin, including DHS personnel, Mowdy, several of the UMC doctors who treated Austin, and the two UMC social workers who had contact with Austin.  The UMC doctors were under the impression that a complaint or report for abuse/neglect had been made to DHS.  In his deposition, Dr. Byrnes testified repeatedly that, given their extensive work-ups of Austin that revealed no organic cause for his malnutrition, he reported to DHS that it was most likely that Austin's family either was intentionally not feeding him properly, or did not

4

understand how to feed him properly. In her affidavit, Dr. Sara Weisenberger, one of Austin's treating physicians during his time at UMC, attested that

> [r]egardless of whether the communication on behalf of the University of Mississippi Medical Center personnel to the Scott County Department of Human Services' worker used the words "abuse" or "neglect", such communications were in fact oral reports to the Mississippi Department of Human Services that Austin Watkins was either being abused or neglected, in that his failure to thrive was medically caused either by being intentionally starved or by his family not knowing how to properly feed him.

The UMC social workers, Dennis and Carpenter, both testified that, to their knowledge, no report of abuse/neglect was made to DHS. Carpenter specifically testified that the doctors must initiate the report process and to her knowledge, no such report was made. Dennis stated that *she* did not make a report of abuse or neglect. However, both were under the impression that Russell and/or DHS were going to follow up with Austin after his discharge.

¶10. In her deposition, Heather Russell testified that she did not recall most of UMC's calls to her, although she remembered some of them. She indicated that UMC did not make a "report" of child abuse or neglect on Austin. She testified that if someone calls in a report, and if it's "screened in," the report is investigated.[4] Lori Woodruff, the deputy administrator for the Division of Family and Children Services, testified that, if what UMC's personnel said is taken as true, DHS should have investigated the allegations concerning Austin. Valerie Grisele, another DHS supervisor, also testified that if what UMC said it reported was correct, DHS should have documented and investigated it.

---

[4]Other DHS employees likewise testified that reports or allegations of abuse are "screened in" or "screened out."

¶11.   On October 28, 2011, DHS moved for summary judgment. DHS argued that all DHS's actions were based upon discretionary functions or duties, thus sovereign immunity barred the action. Attached to the motion was an affidavit executed by Jimmy Gatewood, the associate director of social work for UMC. The affidavit described UMC's policy for reporting suspected child abuse or neglect, and stated that "[a]fter review of records available to me and to the best of my knowledge, UMC inpatient division made no report of suspected abuse or neglect regarding Austin Watkins to any DHS office or any other entity specified in the policy during, or after, his treatment at UMC in 2007." Watkins responded to the motion for summary judgment and also moved to strike the Gatewood affidavit, and DHS replied. The central arguments surrounding the motion for summary judgment were two-fold: 1) whether DHS received reports (either from Jennifer Watkins, UMC, or both) regarding suspected abuse or neglect in June 2007, triggering a nondiscretionary duty to investigate,[5] and 2) whether DHS performed its nondiscretionary duty to obtain references for Mowdy prior to placing Austin with her.

¶12.   The trial court granted DHS's summary judgment on September 18, 2012. It held that no report of suspected abuse or neglect was made to DHS. Specifically, it found that Russell had to make an initial determination or interpretation as to whether a report was made, rendering her actions discretionary and subject to sovereign immunity. It also found that the

---

[5]DHS is required to investigate a report of suspected child abuse or neglect. Unfortunately, the DHS policy in the record before this Court is incomplete – only every other page was produced. The record reveals that DHS produced only every other page to the plaintiffs. It is unclear from the record whether DHS ever produced a complete policy manual, or whether the trial court had the complete manual before it.

6

plaintiff "offered no positive proof that DHS had failed to obtain references" because DHS personnel testified that references were obtained, but that the computer system had malfunctioned, leaving the form blank, and because Mowdy testified as to who her references were. Thus, it concluded that "DHS breached no duty of care and can have no liability herein." The trial court also denied Watkins's motion to strike the Gatewood affidavit, but noted that "even if the Motion to Strike was granted, the outcome would not change the Court's ruling regarding summary judgment."

¶13. Watkins appeals the trial court's judgment to this Court, arguing that the trial court erred 1) by granting summary judgment, because genuine issues of material fact exist as to whether reports were made to DHS regarding Austin, triggering a ministerial duty to investigate, and 2) by denying Watkins's request to either strike the Gatewood affidavit or allow Watkins to depose Gatewood.

## ANALYSIS

### Standard of Review

¶14. This Court reviews questions of law, including the interpretation of the Mississippi Tort Claims Act (MTCA), de novo. ***Miss. Dep't of Human Servs. v. S.C.***, 119 So. 3d 1011, 1013 (Miss. 2013). Likewise, this Court reviews the trial court's grant or denial of summary judgment de novo. ***Honeycutt v. Coleman***, 120 So. 3d 358, 363 (Miss. 2013). Because the proponent of summary judgment has the burden of showing that no genuine issue of material fact exists, this Court must review the evidence in the light most favorable to the nonmoving party. ***Id.*** The credibility of evidence likewise must be viewed in the light most favorable to the nonmoving party. ***Treasure Bay Corp. v. Ricard***, 967 So. 2d 1235, 1240 (Miss. 2007).

7

Summary judgment is accordingly appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." M.R.C.P. 56(c).

***Sovereign Immunity***

¶15.    Any tort claim filed against the government, or an employee thereof, must be brought under the MTCA, the exclusive civil remedy against the government or its employees "for acts or omissions which give rise to a suit." ***Stewart v. City of Jackson***, 804 So. 2d 1041, 1046 (Miss. 2002). The MTCA waives sovereign immunity in certain circumstances, including for liability based on the performance of ministerial duties. However, sovereign immunity is *not* waived for liability "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." Miss. Code Ann. § 11-46-9(1)(d) (Rev. 2012). Thus, if a claim of liability is based on the performance of a discretionary duty, the government has sovereign immunity; however, if a claim is based on the performance of a ministerial duty, sovereign immunity does not apply, and the claim may go forward.

¶16.    "A duty is discretionary when it is not imposed by law and depends upon the judgment or choice of the government entity or its employee." ***Miss. Transp. Comm'n v. Montgomery***, 80 So. 3d 789, 795 (Miss. 2012). To discern whether immunity for a discretionary function is available, a court must determine: 1) "whether the activity involved an element of choice or judgment," and, if so, 2) "whether the choice involved social, economic, or political policy." ***Stewart***, 804 So. 2d at 1047 (quoting ***Jones v. Miss. Dep't***

8

*of Transp.*, 744 So. 2d 256, 260 (Miss. 1999) (*abrogated on other grounds*)) (internal

quotations omitted). Conversely, "[a] duty is ministerial if it is positively imposed by law

and required to be performed at a specific time and place, removing an officer's or entity's

choice or judgment." *Montgomery*, 80 So. 3d at 795.

*Reports of Abuse or Neglect*

¶17. Mississippi Code Section 43-21-353 provides that certain classes of people who work

with children and who have "reasonable cause to suspect that a child is" neglected[6] or

abused[7] "shall cause an oral report to be made immediately by telephone or otherwise and

followed as soon thereafter as possible by a report in writing to the Department of Human

Services." Miss. Code Ann. § 43-21-353(1) (Rev. 2009). Thereafter, DHS "shall"

"immediately" make a referral to the youth court intake unit, which shall investigate the

report. *Id.*; Miss. Code Ann. § 43-21-357 (Rev. 2009) (a preliminary inquiry must be made

to determine whether the interest of the child requires the youth court take further action, and

the preliminary inquiry results in a recommendation). Both sides concede that if a "report"

is made, DHS has a mandatory duty to investigate the report. *See* ***Miss. Dep't Human Servs.***

***v. S.W.***, 974 So. 2d 253, 259-60 (Miss. App. Ct. 2007). Further, DHS high-level

---

[6]A "neglected child" is one whose parent, guardian, or custodian "neglects or refuses, when able to do so, to provide for him proper and necessary care or support, . . . or medical, surgical, or other care necessary for his well-being" or one who is "without proper care, custody, supervision or support" or one who "for any reason, lacks the care necessary for his health, morals or well-being." Miss. Code Ann. § 43-21-105(l) (Rev. 2009).

[7]An "abused child" is a child whose parent, guardian, or custodian "has caused or allowed to be caused, upon the child, sexual abuse, sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other maltreatment." Miss. Code Ann. § 43-21-105(m) (Rev. 2009).

administrators testified that DHS does not wait for the written portion of the statutory report before initiating its investigation.

¶18. DHS argues that no genuine issue of material fact exists. It argues that no report of abuse or neglect was made to DHS. It relies on the affidavit of Jimmy Gatewood, the associate director of social work for UMC, who, after reviewing UMC's records, declared that no report was made under UMC's policy. In addition to arguing that no report was made, DHS argues that its conduct is covered by the discretionary-function exemption, because DHS personnel "must necessarily exercise discretion in determining whether the content of a particular telephone call contains a report of a suspicion of abuse or neglect." It further argues that this judgment is grounded in "social, economic, and political policy" because the "decision to have a state agency enter into a child's life, and the lives of the family of the child, is an important social, economic, and political decision."

¶19. Watkins argues that the discrepancies in testimony regarding whether a report was made create a genuine issue of material fact, which precludes summary judgment. She also maintains that investigating a report is a ministerial duty.

¶20. A genuine issue of material fact exists as to whether a report was made. DHS personnel agree that if UMC reported what its employees claim to have reported (Dr. Byrnes claims to have informed Heather Russell that Austin was being starved, either intentionally or unintentionally), it constituted a "report" that triggered the ministerial duty to investigate.[8] DHS personnel simply deny that UMC communicated this information to Russell. At its

---

[8]Even Heather Russell agreed that, if UMC told her what its employees said they told her, "it should be followed up on."

10

basest level, this is a credibility contest. DHS argues that the Gatewood affidavit should render all other UMC testimony moot, given that it states that UMC did not make a "report" under the *UMC policy*. He did not state that UMC did not meet the statutory definition of a "report," nor does he appear qualified to make such a legal conclusion. Gatewood's affidavit contrasts the deposition testimony of Dr. Byrnes and the affidavit of Dr. Weisenberger. It does not positively dispose of the issue of whether a "report" was made, but is merely another player in the credibility contest, offering evidence to support DHS's position, while the doctors' statements offer evidence to support Watkins's.

¶21. Nothing in the statute mandates that reporters use "magic words" such as "report," "abuse," or "neglect" to convey that they are reporting abuse or neglect. UMC personnel testified that they informed DHS that Austin was likely being starved, either intentionally or unintentionally. If true, such a statement would certainly fit within the statutory definition of a report of a suspicion of neglect or abuse. "Report" is defined by Black's Law Dictionary as "[a] formal or oral written presentation of facts or a recommendation for action." *Black's Law Dictionary* 1326 (8th ed. 2004). Webster's defines "report," in pertinent part, as "something that gives information: a usu. detailed account or statement," or "notification." *Webster's 3d New Int'l Dictionary* 1925 (1961). Further, the statutory definitions of "neglected child" and "abused child" clearly encompass a child being intentionally or unintentionally starved. *See* Miss. Code Ann. § 43-21-105(l) & (m) (Rev. 2009). UMC's statements, if true, certainly are notification that UMC suspected Austin's caretakers were neglecting him or refusing to provide him proper and necessary care and/or that Austin's caretakers had caused or allowed to be caused maltreatment.

11

¶22.	"Credibility is a question of fact that must be decided by the jury." ***Treasure Bay***

***Corp.***, 967 So. 2d at 1240.	"Indeed, this Court consistently holds that decisions as to the

weight and credibility of a witness's statement are the proper province of the jury, not the

judge." ***Doe v. Stegall***, 757 So. 2d 201, 205 (Miss. 2000).	Giving credence to one sworn

statement over another is not appropriate at the summary judgment level. *See **id.*** at 204-06.

This is true even when the ultimate factfinder will be the judge in a bench trial. *See, e.g.*,

***Regan v. Starcraft Marine***, 418 Fed. App'x 310, 312 (5th Cir. 2011) (in a bench trial, the

trial court may be allowed a more lenient factfinding standard for summary judgment *unless*

factual inferences drawn involve witness credibility or disputed material facts)[9]; *see also*

***Giles v. Brown***, 962 So. 2d 612, 618 (Miss. Ct. App. 2006) (in MTCA case, determining that

"a summary judgment motion does not place a court in the role of weighing testimony and

determining the credibility of witnesses . . . such determinations are improper for a court to

_____

[9]The Fifth Circuit has indicated that it may support a more lenient factfinding standard for motions for summary judgment in a bench trial, but it may not have definitively decided the issue. *See **Illinois Cent. R. Co. v. Mayeux***, 301 F.3d 359, 362 n.1 (5th Cir. 2002) ("Although prior panels of this court have entertained the idea of applying a more lenient standard in nonjury trials, this circuit has not actually adopted such a standard."). However, the Fifth Circuit and its district courts have consistently noted that this lenient standard or discretion "does not extend to deciding witness credibility without the benefit of live testimony." ***Dominio v. Allstate Ins. Co.***, 2010 WL 4066647, at *2 (E.D. La. Oct. 15, 2010); ***Matter of Placid Oil Co.***, 932 F.2d 394, 398 (5th Cir. 1991) ("[A] district court must be aware that assessments of credibility come into sharper focus once live witnesses are heard.") ("[I]t makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, *unless those inferences involve issues of witness credibility or disputed material facts*." (emphasis added)); ***Mayeux***, 301 F.3d at 362 n.1 ("Under the suggested more lenient standard, the district judge could grant summary judgment based on inferences drawn from incontrovertibly proven facts, *so long as there is no issue of witness credibility*." (emphasis added)).

make at the summary judgment stage."). The trial court stated that "[i]n the absence of *unambiguous* proof that a report of suspected abuse or neglect was received by DHS, DHS cannot be held liable for any alleged negligent failure to reopen Austin's case." (Emphasis added.) Watkins need not put forth unambiguous proof that a report was made in order to defeat summary judgment, she need only create a genuine issue of material fact. Thus, discounting the statements of Drs. Byrnes and Weisenberger and finding that no report was made was inappropriate at this stage, especially given that evidence and credibility must be viewed in the light most favorable to Watkins.

¶23. DHS's position that DHS has the discretion to determine whether a phone call is a report is also unavailing. The statute gives DHS no discretion to determine that a "report" is not a "report." The plain language of the statute clearly belies this argument.[10] The statute gives DHS no discretion if a report is made.

¶24. Furthermore, DHS's own policies undermine the argument that Russell had the discretion to determine whether the phone calls were a "report."[11] DHS policy indicates that all phone calls such as this are deemed a "report," and *only then*, those "reports" that are not deemed meritorious are "screened out" through the screening-out process. The policy states that: "The decision to 'screen in' or 'screen out' a report should be based upon the reported

---

[10]A recent case decided by this Court illustrates the reaching nature of this argument. In *Little v. Mississippi Department of Transportation*, this Court found that, in determining whether sovereign immunity applies, the analysis must be on the *function*, not the acts used to carry out the function. *Little v. Miss. Dep't of Transport.*, 129 So. 3d 132 (Miss. 2013).

[11]As noted, apparently due to DHS's discovery failure, this Court has only every other page of DHS's policy manual, so the exact policies are unclear. However, enough information can be garnered from what is before this Court to seriously undermine DHS's assertion.

allegations. If the allegations include an action or incident that meets the definition/criteria of neglect, abuse or exploitation, the report should be 'screened in' for investigation." It also mandates that: "**All** allegations stated in the report must be addressed and assessed during the investigative process. The decision to 'evidence' or 'no evidence' the report *must* reflect a careful and objective evaluation, and documentation of all the facts."). DHS policy also indicates that only a supervisor may determine that a "report" may be screened out. DHS procedure for the death of a child also indicates that DHS personnel have no discretion to decide what is a "report." It states that, upon the death of a child, the director must be notified if "[p]rior *reports* concerning the child or family were screened out for MDHS investigation." (Emphasis added.) DHS policy seems to admit that some sort of investigation must occur at the receipt of a "report," but that discretion may come in once the system is set in motion to "screen out" or "screen in" the report. There is no allegation that Russell chose to "screen out" the report; rather DHS argues that Russell decided this was not a "report" at all, something she had no discretion to do. Furthermore, DHS policy indicates that Russell may not have even had the authority make the decision to "screen out" the report.[12]

¶25. It is clear from the statutory language that, if what Drs. Byrnes and Weisenberger attest was communicated to DHS is true, an oral report of abuse or neglect was made to DHS. If what Russell claims was said is true, it is likely that no report was made. Thus, whether

---

[12]It appears that Russell did not follow the intake guide for receiving a report.

a report was made is, at its basest level, a credibility contest, and summary judgment was therefore improvidently granted.[13]

## CONCLUSION

¶26. The trial court erred by granting DHS's motion for summary judgment. A genuine issue of material fact exists as to whether a report was made by UMC personnel, and thus whether DHS's ministerial duty to investigate was triggered. We reverse the Hinds County Circuit Court's grant of summary judgment and remand the case for further proceedings consistent with this opinion.

¶27. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.**

---

[13]DHS argues that Watkins cannot rely on the Social Autopsy in support of her summary judgment, as it is hearsay. It takes particular umbrage with the assertion that Jennifer Watkins reported abuse or neglect to DHS triggering its duty to investigate, an assertion found only in the Social Autopsy. Additionally, Watkins argues that the trial court's failure to strike the Gatewood affidavit was error.

This Court need not decide these issues. Regardless of Jennifer Watkins's alleged report to DHS, or indeed, any information in the Social Autopsy, and regardless of the Gatewood affidavit, there exists ample evidence to create a genuine issue of material fact regarding whether UMC made a report of abuse or neglect to DHS. The depositions and Weisenberger affidavit alone create a genuine issue of material fact regarding whether a report was made. This Court need not look to the Social Autopsy or the Gatewood affidavit for further support.